ZAGER, Justice.
Ricky Lee Putman was charged with one count of first-degree sexual abuse for allegedly performing a sex act on L.R., a two-year-old girl. Putman filed a motion in limine that sought to exclude evidence of child pornography found on his computer and other electronic devices. After an evidentiary hearing, the district court denied the motion in limine, with limitations. The district court allowed the State’s expert to testify at trial that child pornography was found on Putman’s computer and other electronic devices. However, it limited the State’s expert to testifying only to the file names of two videos. A jury convicted Putman, and he appealed, claiming the district court erred when it admitted the evidence of prior bad acts. The court of appeals affirmed. Putman sought further review, which we granted. For the reasons set forth below, we affirm his conviction.
I. Background Facts and Proceedings.
Around 6 p.m. on May 22, 2010, forty-one-year-old Ricky Putman came to the home of Lawrence and Holley Robbins in Arlington, Iowa, to spend time with the couple and their three children. One of the children was two-year-old L.R. After joining the family on a trip to a nearby park, Putman returned with the family to their home around 9 p.m. Shortly after the group returned from the park, Holley’s cousin, fifteen-year-old Alex, came to the house.
Back at the house, the adults drank beer, watched television, and listened to music while the children played. By midnight or 1 a.m., the Robbins children had fallen asleep. The two boys had fallen asleep on the couch, and L.R., wearing a blue dress and a diaper, was carried upstairs to her crib, which was located in a room just adjacent to the bedroom shared by Lawrence and Holley.
Holley spent some more time downstairs with Lawrence, Alex, and Putman before going upstairs to go to sleep. Putman followed Holley up the stairs, climbed into bed with her, and became sexually aggressive towards her. Holley got out of the bed, went downstairs followed by Putman, and told Lawrence and Alex what had just taken place. Holley demanded that Law *4 rence get Putman out of the house. However, this did not occur. Shortly thereafter, Holley again went back upstairs to go to bed, this time followed by Putman and Alex. Putman again crawled into bed with Holley, touched her, and told her to leave Lawrence for him. Holley immediately climbed out of bed and went downstairs a second time, this time followed by Alex and Putman. Holley left the house with Alex around 4 a.m., again telling her husband to get Putman out of the house.
Putman did not leave. Around 4:80 a.m., at Lawrence’s suggestion, Putman went to sleep in Lawrence and Holley’s bedroom. Lawrence, after cleaning up the downstairs, went upstairs to cheek on L.R. in her crib. Lawrence did not notice anything unusual at that time. He also observed Putman sleeping in his and Holley’s bed. Lawrence then went downstairs and fell asleep on a chair. Lawrence awoke around 7 a.m. on May 23 when Alex’s mother, Marilyn Blackford, came to the house looking for Alex.
L.R. came downstairs around 8 a.m. L.R. was not wearing her diaper or the blue dress she had been wearing the previous night. Lawrence did not think this odd as L.R. had removed her own diaper on previous occasions. While Lawrence did notice some blood between L.R.’s legs, he believed she had merely scratched herself. Lawrence put a fresh diaper on L.R. and sat her on the couch. After L.R. cried for a bottle, Lawrence went upstairs to retrieve it from her crib. While he was upstairs, Lawrence exchanged greetings with Putman and noticed that Putman had blood on his shirt and on his hands. Lawrence believed Putman could have cut himself on a broken table beside the bed. Lawrence went back downstairs and fixed a bottle for L.R. Lawrence laid L.R. on the couch where she fell asleep, and he sat in a chair. Lawrence did notice that L.R. was lying awkwardly on the couch.
Shortly afterward, Putman came downstairs. Putman looked at the blood on his hands and clothes and asked Lawrence what had happened. Lawrence told Put-man he may have cut himself on the broken table next to the bed. L.R. awoke, looked at Putman, and moved towards Lawrence. Putman then put his shoes on and left the house.
Eventually Holley returned home. When she arrived, Lawrence was upset and shaking. He told Holley that he had to go, and he went to the home of Marilyn Blackford, Holley’s aunt, who lived a few houses away. While at Marilyn Black-ford’s house, Lawrence asked Marilyn and her boyfriend how a person would know if a child had been sexually molested. Meanwhile, while Lawrence was gone, Holley noticed bruising on L.R.’s face and neck, what she suspected to be bite marks on her ear, and blood on her chest and legs.
Lawrence returned home with Marilyn Blackford. After observing L.R., including opening up L.R.’s diaper, Marilyn Blackford instructed Lawrence and Holley to take L.R. to the hospital in Oelwein, and law enforcement would be contacted. The Robbins family went immediately to the hospital, and the Fayette County Sheriff was contacted.
After being examined at Mercy Hospital in Oelwein, it was determined that the injuries sustained by L.R. were too extensive to be properly treated there. L.R. was subsequently transferred to the University of Iowa Hospitals and Clinics for appropriate treatment. After examinations by pediatric physicians at the University of Iowa Hospitals and Clinics, they concluded that L.R. had suffered vaginal penetration injuries. To repair those injuries, L.R. was taken to surgery and put *5 under general anesthesia. Her injuries required numerous stitches to repair the damage.
After its preliminary investigation to secure the scene and identify possible suspects, the sheriffs department began conducting interviews in the morning hours of May 23. A sheriffs deputy went to Put-man’s home in Arlington. There, the deputy found Putman, who appeared to have recently showered. Putman was advised of his Miranda rights. With Putman’s consent, the deputy began to collect evidence from the Putman home. It became apparent during the investigation that Putman had begun to launder some of his clothing. Ultimately seized from Putman’s home was a recently laundered shirt matching the description of the one Putman was alleged to have worn the previous night.[1] The damp shirt hung from a bedroom door handle while a few other items of clothing tumbled in the dryer. The deputy decided to detain Putman.
Putman was eventually arrested and charged by trial information with sexual abuse in the first degree, a class “A” felony. While in jail, Putman, who lived alone, asked a friend, Rodney Peterman, to go to his house and feed his cat. Peterman built computers as a side business and had built and sold Putman a computer and related electronic devices. Knowing the reason Putman had been arrested, Peterman decided to see what was on Putman’s computer while he was at Putman’s house. On the computer, Peterman found what he suspected to be child pornography. Because of this discovery, and the fact that Putman still owed him money for the computer, Peterman took the computer, which contained a CD and an external hard drive. Peterman took these items to his parents’ house and called the sheriffs department. A deputy from the sheriffs department retrieved the computer, CD, and the external hard drive.
On another trip to feed Putman’s cat, Peterman took more items from Putman’s house. Among the items Peterman took was a box containing miscellaneous tattoo equipment that Peterman had given to Putman. Inside the box, Peterman also found a loose USB drive. Upon returning home, Peterman plugged this USB drive into his own computer. On the USB drive, Peterman found more disturbing materials, so he notified the sheriffs department and dropped off the USB drive at the sheriffs office. The computer and other electronic devices were later turned over to a unit within the Iowa Division of Criminal Investigation (DCI), the Internet Crimes Against Children Task Force. That unit performed a forensic evaluation of the computer and related electronic devices.
Before trial, Putman filed a motion in limine seeking to exclude evidence of prior bad acts. Putman asserted that any information obtained from his computer was not admissible, specifically identifying evidence of child pornography. The State also requested a ruling from the district court on the admissibility of the child pornography, citing motive and identity as potential issues in the case. The district court issued an order permitting the State to offer into evidence images of young child pornography seized from Putman’s computer, per rule 5.404(6) of the Iowa Rules of Evidence. The district court ruled that such evidence of prior bad acts was relevant to the issues of identity, motive, and related issues due to the fact the *6 defense theory of the case was that another person committed the crime and the two-year-old victim was the only witness to the crime as it occurred. Putman then filed a motion requesting the district court reconsider its ruling on the admissibility of the child pornography evidence.
An evidentiary hearing on Putman’s motion to reconsider was held. An investigator for DCI testified at the hearing regarding his investigation of the computer and other electronic devices. The DCI investigator examined the computer’s hard drive, external hard drive, the USB drive, and the CD and found thousands of photographs and over one hundred videos depicting child pornography. Contained within these videos, the DCI investigator discovered two titles of special note as they specifically referenced rapes involving a two-year-old child. The DCI investigator read into the record the two videos’ entire titles and confirmed the videos’ titles described the videos’ content.
The defense cross-examined the DCI investigator, drawing from him several points. First, the DCI investigator testified he was unable to determine whether the USB drive had ever been inserted into Putman’s computer. In addition, he was unable to conclude Putman’s computer had been used to copy files onto the USB drive. Next, regarding the CD, the DCI investigator could not determine that its contents had been placed on the disk using the computer. The DCI investigator also testified he was unsure whether the computer, which had multiple user accounts, was password protected. He acknowledged his investigation could not reveal who downloaded the files onto the computer or other devices. Finally, he conceded that if the computer’s internal clock were altered, then a file’s time stamp would be inaccurate. He knew of no way, however, to determine whether the computer’s clock was accurate at the time a file was downloaded.
At the conclusion of the hearing, the State agreed not to make any mention of the child pornography in its opening statement to the jury and agreed not to display any of the seized child pornography during trial. After the hearing, the district court denied Putman’s motion, finding the State had established Putman’s ownership of the computer, use of the computer, and the chain of custody for the evidence. The court also found the evidence relevant and not unduly prejudicial. Finally, the court bound the State to the agreements it made during the hearing, noting the court had “relied on them in making its ruling.”
At trial, the State called Peterman, who testified he built the computer for Putman and sold it to Putman. Peterman testified that when he sold the computer to Putman it did not contain child pornography. Pe-terman also testified regarding his discovery of the child pornography on Putman’s computer and other electronic devices. The DCI investigator also testified. He explained his forensic investigation into Putman’s computer and the electronic devices. He also testified he found child pornography on all four items that had been taken from Putman’s house. He was allowed to mention only the two video titles, and he did not read the entire video titles to the jury, as he had at the hearing. The DCI investigator testified the video titles matched their content, estimating the girls in the videos to be two or three years of age. No pornographic images were shown to the jury. On cross-examination, the investigator testified he could not determine who was operating the computer or other electronic devices at the time when a file was generated.
Putman was convicted of one count of first-degree sexual abuse. Putman appealed on several grounds, one of which was *7 the admission of the evidence of child pornography, including the two video titles. We transferred the case to the court of appeals, and it affirmed Putman’s conviction. Putman sought further review, which we granted to determine whether the admission of the evidence of child pornography and, specifically, the two video titles, as limited, was proper.
II. Issue on Further Review.
On further review, we have discretion to consider all the issues raised on appeal. State v. Becker, 818 N.W.2d 135, 140 (Iowa 2012). We may let the court of appeals decision on any particular issue stand as a final decision. Id. On further review, we address only Putman’s challenge to the admission of the evidence of child pornography and the two video titles. With respect to Putman’s challenge to the sufficiency of the evidence to convict him, and to the district court’s exclusion of the DCI laboratory report, the court of appeals decision stands as final. See id. (allowing court of appeals decision to stand on an issue not addressed on further review).
III. Standard of Review.
We review evidentiary rulings regarding the admission of prior bad acts for abuse of discretion. State v. Cox, 781 N.W.2d 757, 760 (Iowa 2010). “A court abuses its discretion when its ‘discretion was exercised on grounds or for reasons clearly untenable or to an extent clearly unreasonable.’ ” State v. Long, 814 N.W.2d 572, 576 (Iowa 2012) (quoting State v. Teeters, 487 N.W.2d 346, 349 (Iowa 1992)). “ ‘A ground or reason is untenable when it is not supported by substantial evidence or when it is based on an erroneous application of the law.’ ” In re Det. of Stenzel, 827 N.W.2d 690, 697 (Iowa 2013) (quoting Ranes v. Adams Labs., Inc., 778 N.W.2d 677, 685 (Iowa 2010)). Even if a trial court has abused its discretion, prejudice must be shown before we will reverse. State v. Jordan, 779 N.W.2d 751, 756 (Iowa 2010).
IV.Discussion.
A. Iowa Rule of Evidence 5.404(6 ). This appeal turns on the admissibility of evidence of prior bad acts. Under Iowa Rule of Evidence 5.404(6), evidence of prior bad acts is not admissible for purposes of proving character: “Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith.” Iowa R. Evid. 5.404(6). The evidence “may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.” Id. The rule “exelude[s] evidence that serves no purpose except to show the defendant is a bad person, from which the jury is likely to infer he or she committed the crime in question.” State v. Rodriquez, 636 N.W.2d 234, 239 (Iowa 2001).
In determining whether to admit prior-bad-acts evidence, we rely on a three-step analysis.[2] See State v. Sulli *9 van, 679 N.W.2d 19, 25 (Iowa 2004). A court must first determine whether the evidence is relevant to a legitimate, disputed factual issue. Id. Evidence is relevant if it has “any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” Iowa R. Evid. 5.401. The general test of relevancy is “whether a reasonable [person] might believe the probability of the truth of the consequential fact to be different if [the person] knew of the proffered evidence.” State v. Plaster, 424 N.W.2d 226, 229 (Iowa 1988) (citation omitted) (internal quotation marks omitted). Irrelevant evidence is, of course, inadmissible evidence. Iowa R. Evid. 5.402.
There also “must be clear proof the individual against whom the evidence is offered committed the bad act of crime.” Sullivan, 679 N.W.2d at 25. In assessing whether clear proof of prior misconduct exists, the prior act need not be established beyond a reasonable doubt, and corroboration is unnecessary. State v. Taylor, 689 N.W.2d 116, 130 (Iowa 2004). “There simply needs to be sufficient proof to ‘“prevent the jury from engaging in speculation or drawing inferences based on mere suspicion.” ’ ” Id. (quoting State v. Brown, 569 N.W.2d 113, 117 (Iowa 1997)). Testimony of credible witnesses can satisfy the clear-proof requirement. See Rodriquez, 636 N.W.2d at 243 (concluding testimony of two witnesses was sufficient to support a finding of clear proof).
If the evidence is relevant to a legitimate and disputed factual issue, and the clear-proof requirement is satisfied, the court must determine whether the evidence’s “probative value is substantially outweighed by the danger of unfair prejudice to the defendant.” Sullivan, 679 N.W.2d at 25. We consider a series of factors in weighing probative value against the danger of unfair prejudice. See, e.g., State v. Martin, 704 N.W.2d 665, 672-73 (Iowa 2005) (applying factors to analyze whether the danger of unfair prejudice substantially outweighed probative value). We consider
the need for the evidence in light of the issues and the other evidence available to the prosecution, whether there is clear proof the defendant committed the prior bad acts, the strength or weakness of the evidence on the relevant issue, and the degree to which the fact finder *10 will be prompted to decide the case on an improper basis.
Taylor, 689 N.W.2d at 124. If the danger of the evidence’s prejudicial effect substantially outweighs its probative value, the evidence must be excluded. See State v. Henderson, 696 N.W.2d 5, 12 (Iowa 2005) (holding district court abused its discretion in admitting prejudicial prior-bad-acts evidence). Weighing probative value against prejudicial effect “is not an exact science,” so “we give a great deal of leeway to the trial judge who must make this judgment call.” State v. Newell, 710 N.W.2d 6, 20-21 (Iowa 2006).
B. Relevancy. Putman first attacks the purpose for which the two video titles were admitted. He argues the evidence served no purpose other than to prove he acted in conformity with his character. In response, the State insists the evidence served to show Putman’s motive and identity as the perpetrator, which it claims, were disputed factual issues in the case.
The State advances motive as its first noncharacter purpose for admitting the child pornography video titles. “Motive is the impetus that supplies the reason for a person to commit a criminal act.” 2 Jack B. Weinstein & Margaret A. Berger, Weinstein’s Federal Evidence § 404.22[3], at 404-119 to 404-120 (Joseph M. McLaughlin ed., 2d. ed.2014); see also State v. Richards, 809 N.W.2d 80, 92 (Iowa 2012) (describing motive as the reason why a defendant would have committed murder). We have observed, for example, that revenge and avoiding criminal charges may be motives for committing a crime. See, e.g., State v. Barnes, 791 N.W.2d 817, 827 (Iowa 2010) (finding evidence of defendant’s desire to “get back at” his sister probative of his motive to steal his sister’s property); State v. Nelson, 791 N.W.2d 414, 425-26 (Iowa 2010) (finding evidence of drug dealing relevant to accused murderer’s motive because a drug dealer would be more likely to shoot a buyer if the drug dealer believed the buyer was an undercover police officer). Motive, like any other noncharacter purpose for which evidence might be offered, must have been at issue in the case. See Taylor, 689 N.W.2d at 124 (explaining that the first step in the prior-bad-acts analysis is identifying whether the noncharacter purpose is at issue in the case).
The perpetrator’s motive for sexually abusing L.R. was not a legitimate or disputed issue in this case. The State was not required to prove Putman’s state of mind as an element of the crime, and Putman’s state of mind at the time of the crime was not put in issue. See Newell, 710 N.W.2d at 21 (discussing elements of first-degree murder and the need for evidence on the defendant’s state of mind at the time of the crime in making a relevancy determination). The evidence of child pornography therefore could not be admitted for the purpose of proving Putman’s motive.
The State further advanced identity as a noncharacter purpose for admitting the child pornography evidence. It is thus essential to decide whether identity was at issue in this case. Cf. Taylor, 689 N.W.2d at 124 (holding court must determine whether intent, a nonpropensity purpose, was at issue in the case). Identity of the perpetrator was clearly the primary issue in the case. The State was required to prove beyond a reasonable doubt that Putman sexually abused L.R. Cf. id. (examining the first-degree-burglary statute to decide whether intent was at issue). Moreover, identity was the only disputed issue in the case as the defense sought to shift responsibility for the crime onto the victim’s father, Lawrence Robbins. See *11 Cox, 781 N.W.2d at 771 (explaining identity may be put in issue “[w]hen a defendant argues a crime was committed by another person”). Accordingly, we reject Putman’s contention the State offered the evidence for no purpose other than to prove he was a bad person and that he acted in conformity with his character.
In cases in which evidence of prior bad acts is offered for the purpose of proving identity, we have imposed a more demanding test than the general relevancy test. See, e.g., State v. Butler, 415 N.W.2d 634, 686 (Iowa 1987) (holding rare burglar’s tool used by the defendant in previous crimes and the tool used in the case on appeal were sufficiently similar to permit prior-bad-acts evidence for the purpose of proving identity); State v. Walsh, 318 N.W.2d 184, 186-87 (Iowa 1982) (finding sufficient similarity between circumstances of a homicide the defendant was previously convicted of and the homicide for which defendant was on trial to admit evidence for the purpose of proving identity). “To permit the inference that similar acts establish the same person committed both acts, we have required that the other acts must be ‘strikingly similar’ or of a ‘unique nature.’” In re J.A.L., 694 N.W.2d 748, 753 (Iowa 2005) (quoting State v. Barrett, 401 N.W.2d 184, 189 (Iowa 1987)).
We acknowledge the difference, in broad terms, between Putman’s act of allegedly possessing child pornography and the act for which he was on trial, sexual abuse of a child. Strictly applying the requirement of similarity between prior acts and the act for which the defendant was on trial, one court noted the “wide gulf’ separating “the act of possessing written descriptions or stories about criminal conduct from the act of committing the offenses described.” See People v. Shymanovitz, 157 F.3d 1154, 1159-60 (9th Cir.1998) (holding trial court abused its discretion in admitting magazine articles as prior-bad-acts evidence), overruled, in part by United State v. Curtin, 489 F.3d 935, 943 n. 3 (9th Cir.2007) (“Prior acts evidence admitted under Rule 404(b) ... [requires] ‘some connection’ between the reason for introducing the prior act and the nature of the crimes charged. Any language in Shymanovitz to the contrary is disapproved.”). This court, however, has not applied the similarity requirement so strictly.
We have evaluated similarity by comparing the contents of materials possessed by a defendant to a criminal act committed by the defendant. See, e.g., Barrett, 401 N.W.2d at 189 (comparing “rather sketchy plans” in the defendant’s journal to homicides for which the defendant was being tried). In J.A.L., for example, a juvenile faced a delinquency adjudication for falsely reporting placement of an explosive device in his school. 694 N.W.2d at 750. We analyzed whether the juvenile court should have admitted the defendant’s journal entries, which revealed the juvenile’s fascination with “suicide, death, and murder,” in spite of the broad dissimilarity between the act of placing a bomb threat at a school and authoring or possessing a macabre diary. See id. at 753. Though we held the journal entries should not have been admitted, it was because the journal topics did not contain “plans to place a bomb threat or to kill any of his fellow students,” not because jour-naling, or possessing a journal, lacks striking similarity with the act of placing a bomb threat. See id. Thus, when assessing the relevancy of prior-bad-acts evidence, we look not only for similarities between two acts committed by the defendant, but also for similarities between contents of materials possessed by the defendant and acts committed by the defendant. See id.
*12 Our criminal cases evaluating prior-bad-acts evidence are of two general categories. One category is cases in which there are only general similarities between the prior bad act and the crime for which the defendant is being tried. See, e.g., Cox, 781 N.W.2d at 759-60 (identifying “ ‘common threads’ ” between prior acts of sexual abuse and the acts the defendant was being tried for); J.A.L., 694 N.W.2d at 758 (comparing a preoccupation with death in a journal to threats to bomb a school); Barrett, 401 N.W.2d at 189 (comparing plans to kill a newspaper carrier contained in the defendant’s journal to the life-insurance-scheme killing for which the defendant was on trial). Not surprisingly, we have held generally similar prior-bad-acts evidence inadmissible. J.A.L., 694 N.W.2d at 753; Barrett, 401 N.W.2d at 189.
In the other category are cases in which the acts are indeed strikingly similar. See Butler, 415 N.W.2d at 686 (concluding modified “nippers” used in defendant’s burglaries were sufficiently similar to admit evidence); Walsh, 318 N.W.2d at 186-87 (finding two “bizarre” homicides to be sufficiently similar). Finding striking similarity requires drawing out and comparing the peculiar circumstances of the acts. See Walsh, 318 N.W.2d at 186 (conceding that some similarities between two homicides were “commonplace in crimes of this type” and comparing the “not commonplace” similarities). This case falls into the strikingly similar category.
According to the DCI investigator’s report, which was admitted at the hearing on admissibility, Putman’s computer hard drive contained thousands of photographic images, some of which were images of child pornography. The USB drive contained thirty-five images and fifteen videos of child pornography, the external hard drive contained thousands of images and ninety-four videos of child pornography, and the CD found in Putman’s computer contained 645 images of child pornography. The videos and images show nude children and children engaged in sex acts. What is more, the external hard drive contained amateur photographs of a teenage girl taken with a digital camera. The photographs show a man, believed to be Putman, performing sex acts on the unconscious teen.
None of this evidence was presented to the jury. Indeed, evidence suggesting only a general preoccupation with child pornography may well have been inadmissible in this child sex abuse case. Cf. J.A.L., 694 N.W.2d at 753 (holding a journal showing a fascination with death inadmissible in a juvenile adjudication proceeding for a threat to bomb a school). The district court, however, winnowed out this mass of child pornography evidence, leaving only the evidence of child pornography bearing a striking similarity to the crime for which Putman was on trial. Thus, Rodney Peterman testified at trial that, understanding the charge Putman faced, he observed what he believed to be child pornography on Putman’s computer. He then confiscated the computer and informed law enforcement. The DCI investigator testified he found child pornography on all four items he examined, and he told the jury parts of the names of two videos he found: “Two YO [year old] getting raped” and “Two YO girl getting raped during diaper change.” The DCI investigator also explained the videos showed adult men sexually assaulting girls that he estimated to be two or three years of age.
There is undeniable similarity between the two videos and the act for which Put-man was on trial. Like the video victims, L.R. was two years of age, although it is unclear whether Putman knew L.R.’s exact age. Further, L.R. was put to bed wear *13 ing a diaper. When she came downstairs the next day, the diaper had been removed, and there was blood on her legs. In one video, as its title makes clear, the child’s diaper figures prominently. Like the video victims, testimony confirmed L.R. was the victim of vaginal penetration, which resulted in serious injuries. We conclude there was a striking similarity between the content of the two videos found on Putman’s computer, and the act of sexually abusing a two-year-old girl. Putman’s possessing the two videos involving the violent sexual abuse of very young children by adult men goes to the heart of the disputed issue of identity and makes it more probable he was the person who sexually abused L.R. and not the victim’s father. Accordingly, the prior-bad-acts evidence was highly relevant to the identity of the perpetrator. If the evidence is determined to be relevant, the evidence is “prima facie admissible, even though it illustrates the accused’s bad character.” State v. Elston, 735 N.W.2d 196, 199 (Iowa 2007).
C. Clear Proof. As his next point of contention, Putman insists the State failed to clearly prove he was responsible for downloading the two videos on his computer. As noted, proof of prior bad acts is clear if it prevents the jury from speculating or inferring from mere suspicion. See Taylor, 689 N.W.2d at 130. Putman points out the DCI investigator could not identify who downloaded the material on Putman’s computer. Nor could he determine with certainty, from the computer’s internal clock, when the videos were downloaded. Further, Rodney Pe-terman’s testimony indicates the computer was not password protected, meaning someone other than Putman could have accessed it. Putman also notes Peterman had the computer and other electronic devices in his own possession for some period of time before turning the items over to the sheriff. This evidence, Putman argues, undermines the State’s claim he downloaded the two videos whose titles were mentioned at trial.
The State takes a different view. It argues there was clear proof Putman possessed the videos — the videos on Putman’s computer belonged to Putman, even if he did not download them. First, Peterman testified he built the computer for his friend Putman, and when he sold it to Putman, the computer did not contain any child pornography. In addition, although the computer and hardware were in Pe-terman’s possession before being given to the sheriffs department, he notified the sheriffs department soon after making the discoveries. Next, Peterman testified Putman lived alone at the time he was arrested, diminishing the likelihood the videos on Putman’s computer belonged to or were downloaded by someone else. Also, although Putman denied owning the videos on his computer, he never disputed owning the computer or the other electronic devices. Cf. State v. White, 668 N.W.2d 850, 855 (Iowa 2003) (finding a defendant’s failure to dispute prior bad acts at trial supported a finding of clear proof). Most significant, the DCI investigator testified the same external hard drive that contained one of the two videos also contained photographs of Putman with his daughter, which suggests, at a minimum, that Putman had access to the hard drive, and thus its contents belonged to him. Finally, in its limiting instruction, the district court instructed the jury that this evidence must be shown by clear proof. Considering all the evidence, there was clear proof for the jury to find Put-man possessed the two videos found on his computer without speculating or inferring from suspicion.
*14 D. Balancing Unfair Prejudice Against Probative Value. Since we conclude the evidence was relevant and there was clear proof Putman possessed the two videos, we must now decide whether the danger of unfair prejudice substantially outweighed the evidence’s probative value. See Richards, 809 N.W.2d at 92. As explained above, we balance a series of factors in weighing evidence’s probative value against the evidence’s danger of unfair prejudice. See, e.g., Henderson, 696 N.W.2d at 11-12 (finding evidence’s “strong prejudicial impact” substantially outweighed its probative value).
First, many of our cases have evaluated the existence of clear proof as part of the balancing process. See, e.g., Taylor, 689 N.W.2d at 124 (noting the existence of clear proof is a factor in the balancing process). For purposes of clarity and consistency, whether clear proof exists should remain as part of the balancing process, in addition to being analyzed as an independent analytical step. As noted above, there is clear proof Putman possessed the two videos. This factor supports admission.
We must next consider the need for the evidence that Putman possessed the two videos in light of the other available evidence and the issues in the case. See id. Because Putman denied that he committed the crime, the crucial issue in the case was the identity of the perpetrator, and as already noted, Putman’s possessing the two videos made it more probable he, rather than L.R.’s father Lawrence, sexually abused L.R. See Henderson, 696 N.W.2d at 11 (examining defendant’s defense to determine the need for the evidence in light of the case’s issues). Additionally, there was no forensic evidence that linked Putman to the crime, and the victim was just two years old, incapable of testifying against her abuser. The only additional evidence available to the State at the time of trial was her observed behavior after the assault. Seeing Putman after the assault, L.R. moves towards Lawrence and hides her head in her hands. Thereafter, L.R. is generally afraid of all male strangers and clings to Lawrence. The State’s need to respond to Putman’s assertion that it was Lawrence and not him who was the perpetrator of this sexual assault on L.R. substantially increased the probative value of the evidence of the two videos found in his possession. Since the need for the evidence on the identity of the abuser was therefore high, this supports admission of the evidence.
We also consider the strength or weakness of the evidence on identity. See Taylor, 689 N.W.2d at 124. Again, clear proof Putman possessed the videos showing two- or three-year-old girls being sexually abused is strong evidence suggesting Put-man committed the act similar to the one in the videos against L.R. The most probative evidence on the issue of identity is the similar acts found in the two videos. All of these factors favor admission.
However, this does not end our analysis. We also must determine whether the probative value of this evidence “is substantially outweighed by the danger of unfair prejudice.” Iowa R. Evid. 5.403. Evidence is unfairly prejudicial if it has “ ‘an undue tendency to suggest decisions on an improper basis commonly, though not necessarily, an emotional one.’ ” Newell, 710 N.W.2d at 20 (quoting Plaster, 424 N.W.2d at 231). Even highly probative evidence such as this may be excluded if the danger of unfair prejudice is too great. See State v. Reynolds, 765 N.W.2d 283, 292 (Iowa 2009) (excluding highly prejudicial evidence despite its probative value to demonstrate the defendant’s motive).
There is no question child pornography has “a strong tendency to produce intense *15 disgust.” United States v. Loughry, 660 F.3d 965, 974 (7th Cir.2011) (holding danger of unfair prejudice posed by evidence of “hard core” child pornography outweighed its probative value in prosecution for distribution of “lascivious exhibition” child pornography). Accordingly, the district court in this case, mindful of the prejudicial nature of the evidence, significantly limited the testimony the State was allowed to present to the jury to the two video titles. We have previously indicated that concerns about prejudice to a defendant might be eased by narrowing the scope of the prior-bad-acts evidence presented to the jury. See Barrett, 401 N.W.2d at 188 (explaining “[i]t would lessen our concerns regarding unwarranted prejudice if the statements in the journal concerning plans to harm other persons could be excised” so as to leave only relevant statements, but ultimately deciding against doing so to preserve context).
The district court narrowed the scope of the prior-bad-acts evidence in this case. Consistent with the district court’s ruling on the motion in limine, the State’s expert was allowed to mention that child pornography had been found on each of the electronic devices. He also testified as to the file names of only two videos which were strikingly similar to the sexual assault which occurred here. The jury was not shown any images from these two videos found on Putman’s computer or other electronic devices. The State was not allowed to describe the volumes of photographs and videos of child pornography found on the electronic devices. Nor did the State mention the two videos in its opening statement. Aside from the brief testimony, the State made no mention of the two videos until its rebuttal closing argument — after being brought up by Putman’s counsel. Even then, the State reminded the jury of the “very narrow purpose” for which it could use the evidence of the two video titles. The State thus carefully adhered to the district court’s narrowly tailored order.
To the extent any testimony exceeded the district court’s narrowly defined scope of permissible testimony, it was necessary to establish a context for the discovery of the two videos. Evidence that reveals the context of prior-bad-acts evidence is in some cases permissible. See id. Thus, Peterman testified about his initial discovery of the child pornography. The State’s expert testified that child pornography had been found on each of the devices provided to him. Though these references must factor into the balance, under the circumstances of this case, they are not alone sufficient to tip that balance in favor of excluding the evidence.
Finally, in addition to significantly limiting the testimony presented to the jury, the district court gave a limiting instruction informing the jury of the limited purpose for which the evidence could be used. See State v. Bayles, 551 N.W.2d 600, 608 (Iowa 1996) (explaining a limiting instruction “help[s] to nullify the danger of unfair prejudice”); see also Rodriquez, 636 N.W.2d at 243 n. 2 (advising trial courts to give a limiting instruction “explaining the purpose for which the prior acts evidence may be used” even if unrequested by the defendant). The district court instructed the jury Putman was “not on trial for” possessing child pornography. It also instructed the jury the evidence could “only be used to show motive, intent, or identity of the person charged.” We have explained before that in most cases a limiting instruction such as this is an antidote for the danger of prejudice: “It is only in extreme cases that such an instruction is deemed insufficient to nullify the danger of unfair prejudice.” Plaster, 424 N.W.2d at 232. This is not one of those extreme cases.
*16 The district court’s approach to this highly prejudicial evidence “was a model of caution.” See Richards, 809 N.W.2d at 93 n. 4 (praising a district court’s efforts in sifting through remote, and thus less relevant, prior-bad-acts evidence). The district court winnowed thousands of images and videos of child pornography, leaving only two highly relevant video titles for the jurors’ ears. The district court did not permit the videos to be shown, nor did it permit the State to mention the videos in its opening statements, conditions with which the State strictly complied. Moreover, the district court instructed the jury on the narrow purposes for which this evidence could be used. On balancing the probative value of the evidence in this case against the prejudicial impact of such evidence, we cannot conclude that the district court abused its discretion in allowing into evidence the very limited evidence of the two videos.
V. Conclusion.
To be clear, not all evidence that a defendant possesses child pornography is admissible as prior-bad-acts evidence. Applying our long-standing analysis of the admissibility of prior-bad-acts evidence to the circumstances of this case, we hold the district court did not abuse its discretion when it admitted evidence that Putman possessed specific videos involving child sexual abuse through the admission of the video titles in his trial for first-degree sexual abuse. The evidence was relevant to the issue of the identity of the perpetrator, there was clear proof Putman possessed the two videos, and the evidence’s probative value was not substantially outweighed by the danger of unfair prejudice. Finding no abuse of discretion, we affirm Putman’s conviction.
DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.
All justices concur except WIGGINS, APPEL, and HECHT, JJ., who dissent; and, writing separately, HECHT, J., who dissents.

. Initially, the deputy seized a different shirt that Putman represented he had been wearing the previous night.

. There has been persistent confusion in our cases about whether Iowa Rule of Evidence 5.404(6) requires clear proof that the person against whom the evidence is offered committed the prior bad act. In some cases, it has been suggested a showing of clear proof is required as an independent prong in the pri- or-bad-acts analysis, in addition to finding relevancy and weighing prejudice. In State v. Sullivan, we explained that clear proof and relevancy were the two "conditions” to be established before evidence could "be considered admissible.” 679 N.W.2d 19, 25 (Iowa 2004). In State v. Jones, we concluded that, because evidence of prior bad acts was relevant and clearly proved, the trial court did *8 not abuse its discretion in refusing to exclude it. 464 N.W.2d 241, 243 (Iowa 1990); see also State v. Roth, 403 N.W.2d 762, 765 (Iowa 1987) (requiring relevancy and clear proof before analyzing evidence’s prejudicial effect), abrogated on other grounds by State v. Campbell, 714 N.W.2d 622, 630 (Iowa 2006). In State v. Johnson, we observed that, in addition to the relevancy requirement, "[pjroof of the other offenses must be clear" before explaining the trial court still must balance evidence’s probative value against its prejudicial effect. 224 N.W.2d 617, 620, 621 (Iowa 1974); see also Rodriquez, 636 N.W.2d at 240 ("Since our decision in [State v.] Wade, [467 N.W.2d 283 (Iowa 1991)], we have stated that there must be 'clear proof’ that the defendant committed the prior bad acts.”); State v. Brown, 569 N.W.2d 113, 117 (Iowa 1997) (noting that ”[i]n at least some cases we have added as a final consideration” the clear-proof requirement). Under this strand of cases, it is necessary that the evidence is relevant to some legitimate and disputed issue, that there is clear proof the defendant committed the prior act or crime, and that the evidence’s probative value is not substantially outweighed by the danger of unfair prejudice. See Sullivan, 679 N.W.2d at 25.
In other cases, however, we have evaluated whether there was clear proof as one factor in the multi-factored weighing process, not as an independent prong in the analysis. In State v. Reynolds, which followed Sullivan, we explained a court must determine whether the evidence is relevant to a disputed issue and whether the evidence's probative value is substantially outweighed by the danger of unfair prejudice See 765 N.W.2d 283, 289-90 (Iowa 2009). Rather than expressing the clear-proof requirement as an independent analytical step, we explained that, when a court weighs the prejudicial effect of evidence, it must consider whether there was clear proof it was the defendant who committed the prior bad act. See id. at 290. Other recent cases have stated the test similarly. See, e.g., State v. Henderson, 696 N.W.2d 5, 11 (Iowa 2005) (considering the existence of clear proof as one factor in balancing process without mentioning the clear-proof requirement as an independent analytical step); State v. Taylor, 689 N.W.2d 116, 129-30 (Iowa 2004) (same). Earlier cases also apply the test in this fashion. See, e.g., Wade, 467 N.W.2d at 284 (including proof the accused committed the pri- or act as a consideration in the balancing process, not as an independent analytical step); State v. Plaster, 424 N.W.2d 226, 231-32 (Iowa 1988) (considering whether the accused defendant committed the prior act as part of the balancing process). Under this strand of cases, it need only be found that the evidence is relevant to a legitimate, disputed issue and that the danger of unfair prejudice to the defendant does not substantially outweigh the evidence's probative value. See Reynolds, 765 N.W.2d at 290.
Some requirement of proof the actor against whom the evidence is offered committed the prior act is common. Many jurisdictions consider it as an independent analytical step. See, e.g., State v. Terrazas, 189 Ariz. 580, 944 P.2d 1194, 1196 (1997); People v. Garner, 806 P.2d 366, 373 (Colo. 1991); Johnson v. United States, 683 A.2d 1087, 1093 (D.C.1996); Rittenhouse v. State, 272 Ga. 78, 526 S.E.2d 342, 344 (2000); People v. Thingvold, 145 Ill.2d 441, 164 Ill.Dec. 877, 584 N.E.2d 89, 95 (1991); State v. Jackson, 625 So.2d 146, 149 (La.1993); State v. Faulkner, 314 Md. 630, 552 A.2d 896, 898 (1989); Commonwealth v. Leonard, 428 Mass. 782, 705 N.E.2d 247, 250 (1999); State v. DeWald, 464 N.W.2d 500, 503 (Minn.1991); State v. Floyd, 277 Neb. 502, 763 N.W.2d 91, 98 (2009); State v. Kirsch, 139 N.H. 647, 662 A.2d 937, 942 (1995); State v. Hernandez, 170 N.J. 106, 784 A.2d 1225, 1232 (2001); State v. Holder, 382 S.C. 278, 676 S.E.2d 690, 698 (2009); Harrell v. State, 884 S.W.2d 154, 158 (Tex.Crim.App.1994); State v. Pirtle, 127 Wash.2d 628, 904 P.2d 245, 257-58 (1995).
Still other courts take a slightly different view. In Huddleston v. United States, the United States Supreme Court explained the determination whether proof existed that the actor committed the prior act was subsumed under the relevancy prong of the prior-bad-acts test: "In the Rule 404(b) context, similar act evidence is relevant only if the jury can reasonably conclude that the act occurred and that the defendant was the actor.” 485 U.S. 681, 689, 108 S.Ct. 1496, 1501, 99 L.Ed.2d 771, 782 (1988). Some states take a similar view. See, e.g., State v. McDonald, 500 N.W.2d 243, 246 (S.D.1993) ("The strength of the evidence offered is already part of the relevancy determination.”); State v. McGinnis, 193 W.Va. 147, 455 S.E.2d 516, 524-25 (1994) ("The evidence is relevant only if the jury can reasonably infer that the act occurred and that the defendant was the actor.”). In spite of our divergent caselaw, this court has explained that "the State must present clear proof that the defendant was culpable in the other acts in question” because the *9 "[cjrimes of third persons are not relevant.” Johnson, 224 N.W.2d at 620. Whether the proof requirement is subsumed under the relevancy prong or is viewed as an independent prong, the party offering the evidence must still show sufficient proof the actor against whom the evidence is offered committed the act before a court weighs prejudice. Thus, the result of failing to show sufficient proof will be functionally the same, and the court will not need to weigh the danger of unfair prejudice against its probative value. Cf. Sullivan, 679 N.W.2d at 29 (finding evidence of prior bad acts not relevant to a noncharac-ter purpose and thus not weighing prejudice against probative value).
After reviewing our cases and the diverse approaches of other jurisdictions, we con-elude the better approach is to require, as an independent prong in the prior-bad-acts analysis, "clear proof the individual against whom the evidence is offered committed the prior” act or crime. Jones, 464 N.W.2d at 243. Requiring clear proof accords a defendant protection from the "concern that unduly prejudicial evidence might be introduced under [rjule [5.404(b)]." Huddleston, 485 U.S. at 691, 108 S.Ct. at 1502, 99 L.Ed.2d at 783. Moreover, expressing the requirement of clear proof as an independent prong makes the prior-bad-acts test easier for trial courts and juries to apply. Notably, in this case, the trial court instructed the jury the evidence of two videos on Putman’s computer must have been shown by clear proof.