# IN THE COURT OF APPEALS OF IOWA

No. 22-0861
Filed April 24, 2024

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**LAMONT LLOYD,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Scott County, John D. Telleen,

Judge.


        Lamont Lloyd appeals his conviction for domestic abuse assault, third or

subsequent offense. **AFFIRMED.**


        Sonia M. Elossais of Carr Law Firm, P.L.C., Des Moines, for appellant.

        Brenna Bird, Attorney General, and Aaron Rogers, Assistant Attorney

General, for appellee.


        Considered by Bower, C.J., and Greer and Chicchelly, JJ.

**BOWER, Chief Judge.**

Lamont Lloyd appeals his conviction for domestic abuse assault, third or subsequent offense, challenging the district court's denial of his motion in limine seeking to exclude testimony from his pretrial-release officer. Lloyd also challenges the court's denial of his motion for mistrial. Upon review, we affirm.

## I. *Background Facts and Proceedings*

The State filed a trial information charging Lloyd with domestic abuse assault, third or subsequent offense, stemming from an assault on his girlfriend, T.W., in June 2021. Lloyd entered a plea of not guilty, and the case proceeded to a jury trial. The State presented testimony from several witnesses, including T.W., who testified about her relationship with Lloyd and the assault that took place. The State also presented photographs of T.W.'s injuries. At the close of the State's case, Lloyd moved for judgment of acquittal, which the court denied.

Lloyd then testified, stating he lived in Moline and Rock Island during the time he was in a relationship with T.W., who lived in Bettendorf. Lloyd agreed he stayed with T.W. when he "came to visit" her every month or so, and he would "usually stay for, like, probably, like, a week. Eight, nine nights." Lloyd denied having a key to T.W.'s home, assisting T.W. with bills, or placing utilities in his name.[1] Lloyd conceded he and T.W. were involved in a physical altercation but stated he "wouldn't call it no beating."

---

[1] He acknowledged using T.W.'s address to receive mail but stated he did so "because [he was] moving around" and "never really stayed in one spot like that."

The jury found Lloyd guilty as charged.[2] Lloyd appeals. Additional facts will be set forth below as relevant to his claims on appeal.

## II. Motion in Limine

Prior to trial, Lloyd filed a motion in limine seeking, in part, exclusion of "[a]ny reference to prior arrests, convictions, completed deferred judgments, or bad acts on the part of [Lloyd], unless [Lloyd] testifies and unless the conviction meets the requirements of Iowa R. Evid. 6.609(a) and (b). *See also* Iowa R. Evid. 5.401, 5.402, 5.403, 5.404(b) . . . ." The court addressed the motion at the outset of trial. Specifically, Lloyd challenged the admission of testimony from his probation/pretrial release officer, Dean Milius, about where Lloyd reported his residence to be, pursuant to Milius's supervision of Lloyd. Lloyd claimed:

> The reference to Mr. Lloyd being on supervision or being on probation is harkening back to another charge, and so the jury will automatically be thinking of what he is on supervision for, what he is on probation for, so I do believe that the prejudicial—the danger of unfair prejudice does outweigh any probative value in this specific evidence.

The State countered:

> [Milius] was tasked to supervise the Defendant as part of a case in which he's required to know where the Defendant was residing or living, and the Defendant told him that he was going back home to [T.W.'s home address] in Bettendorf.
> . . . .
> We could just say supervision and that part of Mr. Milius's duty was to ascertain where Mr. Lloyd was residing so that he can testify about the Defendant's statement with respect to his address.
> That's all the State intends to elicit, and when one of the elements of this case is that I have to provide that they were residing or co-habitating and he's denying that he was, it certainly is more probative than prejudicial to that issue.

---

[2] Lloyd stipulated he had prior domestic-abuse-assault convictions.

The court then ruled as follows:

> This is an area I think we need to tread very carefully on. The Defendant has chosen not to stipulate that he was co-habitating with the victim. Therefore, that puts the burden on the State to prove that the parties were co-habitating, or had co-habitated, on the State beyond a reasonable doubt.
>
> Because of that, the Court finds that this evidence is relevant. This, again, would be in the nature of an admission that the Defendant made to his probation officer as to his address, and the Court finds that evidence is highly relevant.
>
> I don't view this as prior bad act evidence. We're not going to get into why he was seeing a probation officer, what his charges were, what he was under supervision for, how long he was under supervision for.
>
> But I believe the probation officer should be allowed to take the stand, identify himself, tell the jury what his job is, that he's a probation officer, and from there I would like the witness to simply refer to the fact that the Defendant was under supervision—not under—not on parole, not on probation, nothing about the charges.
>
> And it should be a simple question of, "As part of that supervision, were you required to determine where he was living?" "Yes." "Did he provide you an address?" "Yes." "What was that address?"

During trial, Milius was questioned as follows:

> Q [STATE]. And what is your occupation? A [MILIUS]. I'm a probation/parole pretrial officer.
>
> Q. Back in June of 2021, was the Defendant under your supervision? A. Yes.
>
> Q. As part of that supervision, were you required to ascertain or find out where he was residing? A. Yes.
>
> Q. And back on June 14, did he tell you where he was residing? A. Yes. I received a phone call from him reporting his address.
>
> Q. And what did he say? A. He reported that he was returning home to Bettendorf at [T.W.'s address] in Bettendorf.
>
> Q. He actually referred to it as his home? A. Yes.

On appeal, Llyod challenges the court's admission of Milius's testimony, claiming it "constitutes evidence of other crimes, wrongs, or acts" and was

"unnecessary, and more prejudicial than probative."[3]   We review evidentiary rulings for an abuse of discretion.  *State v. Tyler*, 867 N.W.2d 136, 152 (Iowa 2015).

Iowa Rule of Evidence 5.404(b) states:

> (1) Prohibited uses.  Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.
> (2) Permitted uses.  This evidence may be admissible for another purpose such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, or lack of accident.

We use a three-step test to decide whether other-acts evidence is admissible.  *See State v. Putman*, 848 N.W.2d 1, 9 (Iowa 2014).   First, the evidence must be relevant to a legitimate issue in dispute.  *Id.*   Second, there "must be clear proof the individual against whom the evidence is offered committed the bad act or crime."  *Id.* (citation omitted).   Third, its probative value must not be "substantially outweighed by the danger of unfair prejudice to the defendant."   *Id.* (citation omitted).

Lloyd claims the reference to Milius's employment as a probation/parole pretrial officer and Milius's statement he was supervising Lloyd led jurors to believe Lloyd had a previous conviction resulting in him being on probation or parole. According to Lloyd, even though a bad act or a crime was not specified, Milius's testimony insinuated to the jury a crime had occurred.

We, like the district court, are hard-pressed to interpret Milius's testimony as prior-bad-acts evidence.  As ordered by the court, the State did not elicit

---

[3] The State claims this issue was not properly preserved for appeal.  We disagree. Because Lloyd made a prior-bad-acts argument in his motion and the court mentioned the issue in ruling on Lloyd's motion, the claim was preserved.

questions from Milius about "why [Lloyd] was seeing a probation officer, what his charges were, what he was under supervision for, [or] how long he was under supervision for." Lloyd had an opportunity to cross-examine Milius to clarify this point. We also believe Lloyd's claim is weakened by his own testimony about his prior incarceration: "I first started talking to [T.W.] when I was in prison, and then we met physically, like, around May of 2020."

In any event, the challenged evidence was relevant to prove an essential element of domestic abuse assault.[4] Lloyd disputed whether he and T.W. "were residing together at the time of the incident or within the year." He expressly denied ever cohabiting with T.W., and instead framed his time at her home as "visit[s]." Even when the State introduced evidence of mail addressed to Lloyd at T.W.'s address, Lloyd explained he used T.W.'s address for his mail because he moved frequently. We acknowledge T.W. testified she and Lloyd were "in an intimate relationship" and they had "live[d] together" during "four to six months" of the prior year. T.W. also stated she and Lloyd shared income and "shared the duty of the

---

[4] The jury was instructed the State had to prove the following elements of domestic abuse assault:

> 1. On or about the 14th day of July, 2021, the defendant did an act which was specifically intended to cause pain or injury to [T.W.]
> 2. The defendant had the apparent ability to do the act.
> 3. The act occurred between either:
> a. Household members who resided together at the time of the incident; or
> b. Persons who have been household members residing together within the past year but not residing together at the time of the incident.

The jury was further instructed: "When two or more alternative theories are presented, or where two or more facts would produce the same result, the law does not require each juror to agree as to which theory or facts leads to his or her verdict."

house." T.W.'s mother testified Lloyd was T.W.'s boyfriend and the two resided together. Even so, "the jury was free to reject certain evidence, and credit other evidence." *State v. Hickman*, 623 N.W.2d 847, 849 (Iowa 2001); *see generally State v. Taylor*, 689 N.W.2d 116, 127 (Iowa 2004) ("Evidence reflecting the nature of the relationship between the defendant and the victim would be crucial to a fact finder resolving the inconsistencies . . . ."). Because Lloyd denied having cohabited with T.W., Milius's testimony about Lloyd's residence was "relevant to a legitimate factual issue in dispute." *Taylor*, 689 N.W.2d at 124. We further conclude the testimony was not unfairly prejudicial to Lloyd. *See id.* We affirm on this issue.

### III. Motion for Mistrial

At the end of trial but before the jury was adjourned for the day, Lloyd assaulted his attorney and had to be restrained by the court attendants. Defense counsel moved to withdraw, and the court granted his request. The next day, replacement counsel took over representing Lloyd and moved for a mistrial. Lloyd declared, "I want a new jury." Defense counsel argued:

> This does not look like a case where Mr. Lloyd necessarily was trying to create a mistrial. The evidence with respect to family or household members went about as well as could be expected. The Court had just denied the State's request to leave the record open.
> I can't speak to Mr. Lloyd's internal motivations, but I don't think you can necessarily assume that it was to create a mistrial. There may have been something else going on, and based on that, we'd request a mistrial. I'm not sure how a jury can possibly overlook what happened yesterday in the context of an assault trial.

The State resisted the motion. The court considered the parties' arguments and denied Lloyd's motion, stating:

All right. . . . The general rule is that a Defendant cannot engage in disruptive conduct and then benefit from that conduct by obtaining a mistrial.

[The State]'s brief does an excellent job of setting forth a number of cases from around the country that basically confirm the conclusion I came to after thinking about this overnight that it would make no sense whatsoever to allow a Defendant if he was dissatisfied with the direction his trial was heading, or just for fun, to assault his attorney and then turn around and say, "I get a redo. I want a new jury that didn't see that, even though I did it."

I think that is totally inappropriate. That turns our system of justice, frankly, on its head. Mr. Lloyd, for whatever reason, chose to engage in this conduct, and he's going to have to bear the consequences of that.

I will do my best as a trial judge to ensure that these jurors affirm that they can overlook what they saw and reach a decision based on the evidence. If more than—we have thirteen jurors at this point. I intend to read them the preliminary instruction tomorrow and then poll them individually and ask them if they can overlook the misconduct and base their decision on the evidence.

Assuming twelve of the thirteen assure us they can do that, then this trial is going to go forward. If one indicates they cannot, I'll listen to arguments about it, but my intention would be to replace that juror with the alternate and proceed. If we have more than two that indicate—two or more that indicate they cannot put this aside, then I will have to look at a mistrial.

I think there's two components to this. There is the Defendant's conduct, and I'm not going to allow him to benefit by that and get a new jury, but if our jurors that we're trusting to make this decision simply come to the conclusion they cannot do this based upon what they saw, then I think that's a different situation. That's not the Defendant's conduct as much as it is the jury that we selected and their individual feelings. So at this point, the Defendant's motion for mistrial is denied.

The parties then discussed the court's preliminary jury instruction, and the court made some amendments to the instruction, per defense counsel's request.

The next day, the court instructed the jury as follows:

The jury witnessed an incident in the courtroom at the conclusion of the court proceeding on March 8 of 2022. The jury is instructed to disregard the Defendant's conduct and base your verdict solely on the evidence presented in the courtroom.

I will now ask each of you to confirm that you are able to follow this instruction. Please answer yes if you are able to disregard the

Defendant's conduct and base your verdict on the evidence presented in the courtroom. Answer no if you are unable to disregard the Defendant's conduct and base your verdict solely on the evidence presented.

All but one juror answered "Yes," indicating they were able to disregard Lloyd's conduct. The juror who answered "No" was excused, and the alternate juror was seated. After closing arguments, the jury found Lloyd guilty as charged.

On appeal, Lloyd claims the court erred in denying his motion for mistrial "because the record lacks evidence [his] conduct was intended to cause a mistrial and because of the nature of the charge [he] was on trial for." He also "wonders" if the court would have granted a mistrial "if trial counsel was female." We review the district court's ruling on motions for mistrial for an abuse of discretion. *See State v. Plain*, 898 N.W.2d 801, 811 (Iowa 2017).

A defendant in a criminal trial is entitled to an impartial jury. Iowa Const. art. I, § 10; U.S. Const. amend. VI. However, a claim the jury "speculated adversely" to the defendant due to an incident in the courtroom does not establish a "reasonable probability of prejudice." *State v. Blackwell*, 238 N.W.2d 131, 138 (Iowa 1976). Rather, a mistrial is appropriate when "an impartial verdict cannot be reached." *State v. Newell*, 710 N.W.2d 6, 32 (Iowa 2006) (citation omitted). As to whether an impartial verdict can be reached,

> [a] trial judge is always in the best position to determine whether such an incident . . . , which it was impossible to anticipate or guard against . . . calls for a mistrial. Only a clear and obvious abuse of a trial court's discretion in refusing a mistrial will justify a reversal of a case by an appellate court upon a cold record. It is impossible to gather from the cold record . . . the atmosphere of the trial itself, the manner in which the words were spoken, or the probable effect, if any, which they had upon the merits of the controversy.

*Blackwell*, 238 N.W.2d at 138 (cleaned up). The "pertinent question" in this case is whether, despite the jury observing Lloyd assault his attorney, the district court was "clearly unreasonable in concluding an impartial verdict could be reached." *See Newell*, 710 N.W.2d at 32.

We do not think the court's exercise of its discretion was clearly unreasonable. *See generally United States v. Smith*, No. 22-CR-352, 2023 WL 7632853, at *7 (S.D.N.Y. Nov. 15, 2023) ("Where the defendant has elected a jury trial and then created the potential prejudice through his own conduct, granting the defendant's request for a mistrial at best gives a defendant a free do-over of any trial the defendant believes is going poorly, and at worse effectively requires dismissal of the indictment if there is no way to prevent similar conduct at future trials."). The court instructed the jurors to "disregard [Lloyd]'s conduct and base [their] verdict solely on the evidence presented in the courtroom" and polled the jurors individually to determine if they were able to do so. *See Blackwell*, 238 N.W.2d at 132–33 ("The jury was then informed that anyone who wished to speak up should do so. And in this regard, ten jurors stated the noon hour events had not affected their ability to be fair and impartial to both sides of the case."). In addition, the court instructed the jury to consider only the evidence presented at trial and not any extraneous matters. The court also took "curative steps" to ensure neutrality by the jury and prevent recurrence of additional disturbances.[5] *See id.*

---

[5] The court informed Lloyd it was "happy to accommodate" him "if [he] want[ed] to wear [his] street clothes" rather than his "jail uniform." The court also told Lloyd it was "important" for him to be "in the courtroom for the closing arguments" if Lloyd could "promise [he would] behave and have no more outbursts."

Lastly, we observe "the evidence against [Lloyd] was strong." *See Newell*, 710 N.W.2d at 33; *see also State v. Greene,* 592 N.W.2d 24, 32 (Iowa 1999) (considering strength of evidence in concluding no prejudice warranting a mistrial). We affirm on this issue.

**AFFIRMED.**