# IN THE COURT OF APPEALS OF IOWA

No. 16-0737
Filed August 2, 2017

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**LEROY DANIEL KULA JR.,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Fayette County, Richard D. Stochl,

Judge.

        The defendant appeals his convictions and sentences.  **AFFIRMED.**

        Mark C. Smith, State Appellate Defender, for appellant.

        Thomas J. Miller, Attorney General, and Bridget A. Chambers, Assistant

Attorney General, for appellee.

        Considered by Vaitheswaran, P.J., Mullins, J., and Blane, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2017).

**BLANE, Senior Judge.**

Defendant Leroy Kula Jr. appeals his convictions and sentences for two counts of sexual abuse in the second degree and two counts of sexual exploitation of a minor, entered following a bench trial. He contends the trial court erred (1) in admitting evidence of prior bad acts and (2) relying upon improper factors in imposing sentence. For the reasons discussed below, we reject Kula's claims and affirm.

## I.    Procedural Background.

On November 7, 2014, Kula was charged with two counts of sexual abuse in the second degree, in violation of Iowa Code section 709.3(1)(b) (2013), class "B" felonies, for events occurring between January and October 2014 involving two children under age twelve. On November 17, Kula entered a plea of not guilty. Kula waived his right to a jury and consented to a bench trial.

On October 13, 2015, the State filed an amended trial information charging Kula with (count I) sexual abuse in the second degree, in violation of Iowa Code sections 709.1 and 709.3(1)(b), alleging Kula, during "the calendar year 2014 . . . did perform a sex act on J.K., a child under the age of twelve"; (count II) sexual abuse in the second degree, in violation of same code sections, for allegedly during "the calendar year 2014 . . . [performing] a sex act on S.K., a child under the age of twelve"; (count III) sexual exploitation of a minor, a class "C" felony, in violation of Iowa Code section 728.12(1), alleging that Kula during "the calendar year 2014 . . . did employ, use, persuade, induce, coerce, solicit, knowingly permit, or otherwise cause S.K., a minor, to engage in a prohibited sexual act while having knowledge or intending that the prohibited sexual act be

photographed, filmed, or otherwise preserved in a visual depiction"; and (count IV) sexual exploitation of a minor in violation of the same code section but as to L.R.

On January 6, 2016, Kula confirmed his waiver of a jury and consent to a bench trial and trial commenced to the court. On March 24, the trial court filed findings of fact and conclusions of law, finding Kula guilty on all four counts of the amended trial information. Kula was later sentenced to twenty-five years each on counts I and II and ten years each on counts III and IV. Counts I and II were ordered to be served consecutively with each other; counts III and IV were ordered to be served concurrently with each other, but consecutively with the sentences in counts I and II. In addition, Kula was ordered to register as a sex offender, serve a lifetime special sentence on each count, comply with DNA profiling, and pay victim restitution.

Kula appeals.

## II.     Facts.

The district court entered written findings, which are summarized here. Kula is thirty-five years of age. He married his wife, Suzette, in 2007, but they have been separated since April of 2011. She lives in Grinnell with her three children, including J.K. (born 2008) and S.K. (born 2010). After their separation in 2011, both Kula and Suzette lived in Grinnell and shared care of the children. In January 2014 Kula moved to Arlington with his fourteen-year-old son from a prior relationship. Suzette assumed primary care of J.K. and S.K., and Kula had visits on alternating weekends and extended time during the summer. Suzette had surgery in June of 2014 and was unable to care for the children. J.K. and

S.K. stayed with Kula in Arlington for two weeks. When they returned to their mother, they were very emotional and acting strangely. They were both crying for unknown reasons, wetting their pants and reluctant to go on visits with Kula. They were also acting out sexual behavior with Barbie dolls. Their behaviors continued into the fall of 2014.

When staying with Kula, J.K. shared a bedroom with S.K. E.K. and Kula had their own room. During visits, J.K. and S.K. would play with their friends, L.R. and her sister, M.M. L.R. (born 2008), lives in Arlington with her dad, brother and sister. She is in second grade. She knows Kula because she used to go to his house with her dad and siblings. When she visited the Kula home, Kula let her try on different clothes. He had different swimsuits for her to wear, and she changed in and out of those suits in J.K.'s bedroom. She was not allowed to keep the clothes. L.R. often spent the night at Kula's house. She slept in J.K. and S.K.'s bedroom but also slept with Kula in his bed beside him. L.R. testified, "[H]e [Kula] had sex with me." She said it happened in the middle of the night in his bedroom while the other children were sleeping. She did not know what "have sex means" but remembered that Kula was naked and she had no shirt on but had pants on. She is unable to specifically remember what happened.

On several occasions, J.K. came back from visits with redness in her vaginal area. Kula explained to Suzette the redness was likely caused by a new soap. Suzette also mentioned her observations of the children's behavioral changes to Kula. He told her that he had not witnessed any problems. In October of 2014, the children were riding home with Suzette following a visit with

Kula. J.K. told her mother she had a secret. She said, "[Kula] put his penis on me." S.K. then told her that Kula "does the same thing to me" and made a simulated masturbation motion.

J.K. and S.K. were able to identify body parts, including the vagina and penis. Each referred to her vagina as her "pee pee." On more than one occasion Kula put his penis on J.K.'s and S.K.'s "pee pees." Each girl saw Kula's penis in his bedroom and it actually touched her "pee pee." Each time this happened in Kula's bedroom on his bed. J.K. also saw Kula go into the bedroom with either S.K. or L.R. There were occasions when J.K., S.K., or L.R. slept with Kula in his bed.

S.K. also remembers Kula taking pictures of her "pee pee" with his phone. Her legs were "out" or spread apart when he took pictures of her "pee pee." He asked her to keep some things secret. No photographs matching this description were found or offered into evidence.

Based upon the disclosures J.K. and S.K. made to their mother, Suzette contacted child protective services. After the girls were interviewed, the matter was reported to the Fayette County Sheriff. Fayette County Deputy Sheriff James Davis obtained an arrest warrant for Kula and a search warrant for Kula's rented home in Arlington. Pursuant to the search warrant, sheriff's deputies conducted a search on October 31, 2014. They immediately noticed a camera surveillance system set up both outside and inside the home. The cameras were hooked up to various recording devices. The officers discovered numerous DVDs and VHS tapes located throughout the house in duffel bags, closets and drawers. Over 200 tapes were seized.

Deputy Davis viewed all of the DVDs and VHS tapes. He discovered nude photographs and videos of L.R. changing her clothes in a bedroom in Kula's rented home. Davis knew L.R. and identified her in the tape. One of the videos shows L.R. in a bed under the covers; Kula enters the bedroom, puts his hand over the covers, rubs L.R.'s back, pulls back the covers, wipes her off with what appears to be a towel and tells her to get dressed and come eat some supper. L.R.'s father is also seen on the same video. Another video was taken from a camera that was located about one foot off of the floor in J.K. and S.K.'s bedroom. It shows L.R. changing clothes, and between several outfits she is naked. Videos also contain images of other children dressing and undressing. Davis was able to identify some of the minors as family members. However, some of the other videos appear to have been taken by Kula when he lived in Grinnell, Independence, and Oelwein.

J.K and S.K. both testified outside of the presence of Kula via closed circuit television. L.R. testified in the courtroom with Kula present. Deputy Davis testified as to the content of the videos confiscated from Kula during execution of the search warrant. The videotapes themselves were not offered into evidence.

## III. Prior Bad Acts.

### A. Standard of Review.

We review a ruling on the admission of evidence of prior bad acts for abuse of discretion. *State v. Cox*, 781 N.W.2d 757, 760 (Iowa 2010). "A court abuses its discretion when its 'discretion was exercised on grounds or for reasons clearly untenable or to an extent clearly unreasonable.'" *State v. Putman*, 848 N.W.2d 1, 8 (Iowa 2014) (citations omitted). "A ground or reason is

untenable when it is not supported by substantial evidence or when it is based on an erroneous application of the law." *Id.* (quoting *In re Det. of Stenzel*, 827 N.W.2d 690, 697 (Iowa 2013)). Even if a trial court has abused its discretion, the appellate court will not reverse absent a showing of prejudice. *Id.* (citing *State v. Jordan*, 779 N.W.2d 751, 756 (Iowa 2010)).

### B. Discussion.

Kula challenges his convictions on the ground the district court erroneously admitted testimony from Deputy Davis that video recordings found in Kula's home showed girls other than the victims named in the amended trial information dressing and undressing. Additionally, the deputy was allowed to testify some of the tapes showed Kula in the room with the children and also depicted him committing a sex act with a young girl. Kula contends Iowa Rule of Evidence 5.404(b) precludes the evidence from being admitted.

The State responds that the district court did not abuse its discretion because the challenged evidence was admitted only on the two charges of sexual exploitation of a minor, where the evidence was relevant on the issues of identity, intent, and absence of mistake. Additionally, the actual videos were not admitted and there was only limited testimony about the contents of the videos; thus, the probative value of the evidence was not substantially outweighed by any danger of unfair prejudice in Kula's bench trial.

The admissibility of other prior bad acts evidence is governed by Iowa Rule of Evidence 5.404(b)[1]:

---

[1] Effective January 1, 2017, the rule has been divided into two subparts, but it remains substantially the same. It now reads:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The rule is a codification of Iowa's commonlaw standard that one crime cannot be proved by proof of another. *State v. Casteneda*, 621 N.W.2d 435, 439 (Iowa 2001). The intent of the rule is to exclude from the factfinder's consideration "evidence which has no relevancy except to show that the defendant is a bad person and thus likely committed the crime in question." *Id.* at 439-40. There are also constitutional implications when prior bad acts evidence is at issue: "Based on Iowa's history and the legal reasoning for prohibiting admission of propensity evidence out of fundamental conceptions of fairness, . . . the Iowa Constitution prohibits admission of prior bad acts evidence based solely on general propensity." *Cox*, 781 N.W.2d at 768.

Our courts employ a three-step analysis to determine whether prior-bad-acts evidence is admissible. *Putman*, 848 N.W.2d at 8. First, the court must determine whether the evidence is relevant and material to a legitimate, disputed, factual issue. *Id.* at 9. "Evidence is relevant if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Id.* (quoting Iowa R. Evid. 5.401). The general test of relevancy is "whether a

---

b. *Crimes, wrongs, or other acts.*

(1) *Prohibited use.* Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in in accordance with the character.

(2) *Permitted uses.* This evidence may be admissible for another purpose such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

Iowa R. Evid. 5.404(b).

reasonable person might believe the probability of the truth of the consequential fact to be different if the person knew of the proffered evidence." *Id.* If the evidence is relevant to establish a legitimate issue in the case, it is prima facie admissible regardless of any tendency to establish the defendant's bad character. *State v. Rodriquez*, 636 N.W.2d 234, 249 (Iowa 2001).

Second, there must be "clear proof the individual against whom the evidence is offered committed the bad act or crime." *Putman*, 848 N.W.2d at 9. The other act need not be established beyond a reasonable doubt and corroboration is unnecessary. *Id.* (citing *State v. Taylor*, 689 N.W.2d 116, 130 (Iowa 2004)). Evidence of prior bad acts need only be clear and complete enough to allow the fact finder to find the defendant did the act, without resorting to speculation or mere suspicion. *Id.*

Third, the court must determine whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice to the defendant. *Id.* If the probative value is outweighed by the danger of prejudice, then the prima facie admissibility of the evidence is overcome and the court must exclude the evidence. *State v. Sullivan*, 679 N.W.2d 19, 25 (Iowa 2004); *see* Iowa R. Evid. 5.402.

**Step 1: Relevance.** The sexual exploitation statute provides, in part:

> It shall be unlawful to employ, use, persuade, induce, entice, coerce, solicit, knowingly permit, or otherwise cause or attempt to cause a minor to engage in a prohibited sexual act or in the simulation of a prohibited sexual act. *A person must know, or have reason to know, or intend that the act or simulated act may be photographed, filmed, or otherwise preserved in a visual depiction*.

Iowa Code § 728.12(1) (emphasis added). In this case, the relevant definition of a "prohibited sex act" was "[n]udity of a minor for the purpose of arousing or satisfying the sexual desires of a person who may view a visual depiction of the nude minor." Iowa Code § 728.1(7)(g).

The State was required to prove Kula caused the victims to become nude and that he knew the victims were being filmed or photographed, or that he intended that they would be filmed or photographed, and that Kula acted for the purpose of arousing or satisfying his own sexual desires, or those of another who might view the videos. The State was also required to prove Kula's identity as the person who recorded the videos because at trial, Kula raised the issue whether the videos of L.R. might have been recorded by his teenage son, E.K., who lived with him. *See Cox*, 781 N.W.2d at 771 (explaining identity may be put in issue "[w]hen a defendant argues a crime was committed by another person").

In cross-examining Deputy Davis, defense counsel brought out testimony that around the time officers executed the search warrant at Kula's home on October 31, 2014, E.K. was living with his father. The deputy did not know how long E.K. had been living there, but he knew the boy had been there at least since the summer of 2013.

In addition, defense counsel contended in closing argument that there was insufficient evidence Kula committed the acts charged, arguing,

> The other thing to consider is that Mr. Kula did not have exclusive control of this home. His fourteen-year-old son [E.K.] was there. When thinking about all this camera equipment and how cameras can be switched from one to the other, it's not just Mr. Kula in that home; it is a fourteen-year-old boy there as well.

Defense counsel returned to that theme later in his closing argument:

[I]n the exploitation counts, who's doing the filming here? There's a lot of switching around, and it easily could have been [E.K.] is the one behind the filming that the court has received as exhibits.

Kula placed identity of who committed the crimes at issue by seeking to shift responsibility for the crimes onto his son.

The district court overruled Kula's rule 5.404(b) objection to Deputy Davis's testimony. Kula's trial was to the court, and the trial judge did not state the reasons for his ruling at the time it was made. The court later explained its evidentiary ruling in its written order, finding Deputy Davis's testimony was admissible to prove: (1) the videos of L.R. that were the basis for one of Kula's charges of sexual exploitation of a minor were not taken by accident; (2) Kula intended that the prohibited sex acts with L.R. and S.K would be filmed or photographed; (3) that the videos of L.R. and the photograph of S.K. were taken for the purpose of satisfying Kula's sexual desires; and (4) identity of Kula as the person who committed the criminal acts.

Thus, at trial, Deputy Davis was allowed to testify that officers seized over 200 videotapes and DVDs from Kula's home. Among those were homemade videos showing children other than the victims in this case dressing and undressing. Kula appears with the children in some of the footage. In one of the videos, Kula enters the room and prompts a young girl to try on several outfits that he had purchased for her. Before Kula leaves the room, he assures the girl she is alone in the room and can change in private. In fact, the child was being recorded. The deputy also testified the homemade videos were filmed in a number of different locations. Authorities were able to determine that some of the footage was taken at Kula's home in Arlington, while other recordings were

made in Grinnell, Independence, and Oelwein. Some of that footage showed Kula performing a sex act with an identified minor.

The district court was within its discretion in admitting the challenged testimony under rule 5.404(b) to establish intent, knowledge, lack of mistake, and identity. Therefore, the court did not abuse its discretion in admitting Deputy Davis's testimony. The evidence that Kula videotaped other young girls changing clothes on multiple dates and in multiple locations, that those videotapes showed him committing a sex act with a known minor, and that Kula saved the videos, was probative on the issue of whether Kula knowingly recorded L.R. and photographed S.K. while they were nude and that he did so to satisfy his own prurient interests or those of others who would view the tapes or photographs. Likewise, Deputy Davis's testimony was relevant to negate that Kula accidentally captured nude footage of L.R. on his home security system, that he accidentally activated cameras in the rooms where the girls were changing, or that he intended to record and photograph only activities of the children that could be lawfully filmed.

The fact that the other videos showed young girls were recorded in other towns undercut Kula's attempt to shift the blame to his son, as did the fact that Deputy Davis's testimony about the videos was that Kula appeared in those videos interacting with the girls, encouraging them to change clothes, and performing a sex act with a minor. The other videos—the claimed prior-bad-act evidence—supported the State's position on the disputed issue of identity and made it more probable that Kula, not his son, was the person who filmed L.R. and photographed S.K. Accordingly, the prior-bad-acts evidence was relevant in

identifying Kula as the perpetrator. As a general rule, where evidence of prior bad acts is offered for the purpose of proving identity, there is a more demanding test than the general relevancy test. "To permit the inference that similar acts establish the same person committed both acts, we have required that the other acts must be 'strikingly similar' or of a 'unique nature.'" *Putman*, 848 N.W.2d at 11 (quoting *In re J.A.L.*, 694 N.W.2d 748, 753 (Iowa 2005)). Here, that requirement was met. Deputy Davis's testimony about the content shows there was a striking similarity between the videotapes of L.R. in this case and the other videos. The challenged evidence was relevant and material to several legitimate, disputed, factual issues.

*Step 2: Clear proof defendant committed prior bad acts.* Clear proof is a lesser standard than "beyond a reasonable doubt." *State v. Taylor*, 689 N.W.2d 116, 130 (Iowa 2004). The testimony of a credible witness can satisfy the clear-proof requirement. *See State v. Richards*, 879 N.W.2d 140, 152 (Iowa 2016) (stating a victim's testimony is enough to establish "clear proof" and the testimony need not be corroborated). Here, Deputy Davis's testimony constituted clear proof it was Kula who committed the prior bad acts. The fact that Kula appeared in the videos encouraging other girls to disrobe and is also shown committing sex acts is highly persuasive evidence that Kula was the one making the tapes or that he knew that they were being made. In addition, the testimony of Deputy Davis constituted clear proof that Kula recorded and retained the exploitative videos found in his home.

*Step 3: Probative value vs. unfair prejudice.* The district court also properly found that the probative value of Deputy Davis's testimony outweighed

any danger of undue prejudice.  First, this evidence was necessary to prove elements of the offense.  The State had video footage showing L.R. dressing and undressing, but the only evidence that Kula knowingly videotaped her naked for the purpose of sexual gratification was the tape itself.  The strongest evidence of Kula's knowledge and prurient intent came from the evidence that he recorded multiple young girls at multiple locations undressing and engaged in a sex act with at least one of those girls.

The evidence was even more critical to prove that Kula sexually exploited his daughter S.K.  S.K. testified that Kula photographed her "pee-pee."  She described him taking photographs while she was sitting on his bed with her underwear off and her legs "out."  However, no photograph was found.  S.K. was only five years old at that time, and her testimony was not detailed.  Evidence that Kula had previously filmed young girls changing clothes and had committed a sex act on at least one of those girls was essential to prove Kula photographed S.K., that he intentionally photographed her genitals, and that he did so with the required prurient intent.  The probative value of the evidence under these circumstances was substantial.

Finally, the evidence's probative value is not substantially outweighed by the danger of unfair prejudice.  *See* Iowa R. Evid. 5.403.  Kula's case was tried to the court, which greatly reduces the possibility that the trier of fact was unfairly or unduly influenced by the evidence of the prior bad act.  *See State v. Casady*, 491 N.W. 2d 782, 786 (Iowa 1992); *see also State v. Richards*, 879 N.W.2d 140, 152 (Iowa 2016) (recognizing that a jury is more likely than a judge to decide a case on an improper basis).

The danger of unfair prejudice to Kula in this case was low. The evidence of his prior bad acts was damaging to his defense; however, the fact that evidence is damaging does not make it inadmissible. *State v. Walsh*, 318 N.W.2d 184, 187 (Iowa 1982). Only evidence which is *unfairly* prejudicial is subject to exclusion. Iowa R. Evid. 5.403. Testimony regarding Kula's possession of videotapes that showed child exploitation and sex acts on children would not have roused the district court judge to "overmastering hostility," given the very serious nature of the crimes charged. *See State v. Larsen*, 512 N.W.2d 803, 808 (Iowa Ct. App. 1993) ("One factor often considered by courts in balancing the probative value of evidence against its potential for unfair prejudice is the comparative enormity of the charged and uncharged crimes."). The nature of the other acts described by Deputy Davis was virtually identical to those for which Kula was on trial. Those other acts were not, therefore, likely to provoke the factfinder to convict Kula on an improper basis.

Any prejudicial effect of the prior bad acts evidence was blunted in this case because the trial court did not view the videos. The recordings themselves were not introduced at Kula's trial; the only evidence about those recordings was the limited testimony of Deputy Davis. The State appears to have carefully restricted its evidence so as to offer only that information necessary to prove Kula's identity as the person who made video recordings of L.R. and who photographed S.K., that he did these acts intentionally rather than accidentally, and that he acted with the intent to satisfy his own sexual desires or those of another.

**IV.    Sentencing.**

**A.  Standard of Review.**

Review of a district court's sentencing decision is for the correction of error at law.  *State v. Sailer*, 587 N.W.2d 756, 758 (Iowa 1998).  "A sentence will not be upset on appellate review unless the defendant demonstrates an abuse of trial court discretion or a defect in the sentencing procedure, such as trial court consideration of impermissible factors."  *Id.* at 758-59.  "A district court may not consider an unproven or unprosecuted offense when sentencing a defendant unless (1) the facts before the court show the defendant committed the offense, or (2) the defendant admits it."  *State v. Jose*, 636 N.W.2d 38, 41 (Iowa 2001).

A district court's sentencing decision enjoys a strong presumption in its favor.  *State v. Peters*, 525 N.W.2d 854, 859 (Iowa 1994).  To overcome the presumption, a defendant must affirmatively show that the district court relied on improper factors such as unproven offenses.  *Sailer*, 587 N.W.2d at 762.

**B.  Discussion.**

Kula contends the district court erred in considering unproven offenses— evidence that he had videotaped children other than the named victims in the amended trial information.  He argues those were unprosecuted or unproven charges and should not have been considered.  The State acknowledges the district court considered evidence Kula had committed other offenses but argues those offenses were proven at Kula's trial and, therefore, were properly considered in determining the sentence.

At Kula's sentencing hearing, the district court explained the reasons for the sentence it imposed:

> The reason for my sentence is the defendant's age, the circumstances of this offense, the age of the victims. I have also taken into consideration other findings of fact I made in this file; one was evidence of the videotaping of young children that was found within your home. Based on the testimony of the officers, it didn't just include the two children we're concerned about here, but there was evidence that this had taken place in the communities of Grinnell, Independence and Oelwein. If this wasn't something— obviously you weren't convicted of those, but I'm certainly taking those into consideration that this has been a pattern of yours that didn't just exist for a short period of time during the year we're concerned about. I also take into consideration the evidence as it was presented. I watched two little girls testify in front of me hugging teddy bears and just realized how much of their innocence you stole from them, and for that I do not believe it is safe for society to release you until a substantial time has passed.

As noted, the district court may not consider an unproven or unprosecuted offense when sentencing a defendant unless (1) the facts before the court show the defendant committed the offense, or (2) the defendant admits it. *Jose*, 636 N.W.2d at 41. "When a sentence is challenged on the basis of improperly considered, unproven criminal activity, 'the issue presented is simply one of the sufficiency of the record to establish the matters relied on.'" *State v. Kurka*, No. 14-0776, 2015 WL 1332018, at *5 (Iowa Ct. App. Mar. 25, 2015) (quoting *State v. Longo*, 608 N.W.2d 471, 474 (Iowa 2000)). "'There is no general prohibition against considering other criminal activities by a defendant as factors that bear on the sentence to be imposed.'" *Id.* (quoting *Longo*, 608 N.W.2d at 474). The other criminal activities need not be proven beyond a reasonable doubt. *Longo*, 608 N.W.2d at 475 (noting the standard of proof during the sentencing stage is lower than the standard used during trial).

The district court did not err in considering evidence that Kula had videotaped other young girls. Although Kula was not charged with those crimes,

those offenses were proved by the evidence presented at this trial. The testimony of Deputy Davis about the other video recordings sufficiently proved Kula committed the uncharged acts. We have already held above that such evidence was admissible. The district court could properly consider that evidence as a factor in imposing Kula's sentence.

### V.      Kula's pro se claims.

In his pro se supplemental brief, Kula raises one express claim of ineffective assistance of counsel and four other claims that are in substance claims of counsel's ineffectiveness. His claims of ineffective assistance cannot be decided on the existing record. They can be addressed only in a later postconviction proceeding. *See State v. Johnson*, 784 N.W.2d 192, 198 (Iowa 2010).

Kula also raises claims that may not be claims of ineffective assistance of counsel.[2] These claims were not raised before the trial court and are based on alleged facts and evidence not contained in the existing record. For this reason, we are not at liberty to address them. *State v. Scalise*, 660 N.W.2d 58, 61 (Iowa 2003) ("Ordinarily, we do not consider issues raised for the first time on appeal."). Those claims, to the extent they may involve ineffective assistance of counsel, may be addressed in a postconviction proceeding.

---

[2] Kula makes pro se claims against the Fayette County Sheriff's Office, including unlawful search of his residence that exceeded the search warrant, lying to the department of criminal investigation, covering up a break-in of his residence, and falsifying evidence at trial. He makes claims of witness tampering and coercion. Finally, he claims the trial judge was prejudiced against him.

**VI.    Conclusion.**

After considering Kula's arguments, we find the district court did not abuse its discretion when admitting evidence of Kula's prior bad acts.  Thus, we affirm Kula's conviction.  Because the district court did not consider improper factors when sentencing Kula, we also affirm Kula's sentence.  His claims of ineffective assistance of counsel are preserved for postconviction relief.

**AFFIRMED**.