# IN THE COURT OF APPEALS OF IOWA

No. 21-0252
Filed April 13, 2022

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**STONE THOMAS GRAHAM,**
    Defendant-Appellant.

_____

    Appeal from the Iowa District Court for Des Moines County, John M. Wright, Judge.

    A defendant appeals his convictions for assault on a peace officer with a firearm and assault with intent to inflict serious injury. **AFFIRMED.**

    Martha J. Lucey, State Appellate Defender, and Rachel C. Regenold, Assistant Appellate Defender, for appellant.

    Thomas J. Miller, Attorney General, and Martha E. Trout, Assistant Attorney General, for appellee.

    Considered by May, P.J., and Schumacher and Badding, JJ.

**SCHUMACHER, Judge.**

Stone Graham appeals his convictions for assault on a peace officer with a firearm and assault with intent to inflict serious injury.  He contends the district court violated his right against double jeopardy when it sentenced him to consecutive sentences on these two convictions.  He also claims evidence was admitted that was not relevant and that was unduly prejudicial.  We find the offenses do not merge.  Further, the district court did not abuse its discretion when admitting the challenged evidence.  Accordingly, we affirm.

## I.    Background Facts & Proceedings

Based on the exhibits and testimony at trial, a reasonable jury could find these facts.  On November 7, 2019, Lacey Harris and Graham were having a dispute over the purchase of marijuana.  Graham threatened Lacey's physical well-being.  As a result of concerns for her safety, Lacey asked her brother to come to her house on Amelia Street in Burlington.  Lacey's brother, Jacob Harris, and his friend, Joe George, arrived and parked in front of Lacey's house.  Jacob and Graham argued on the phone; Jacob informed Graham that they were waiting for him if he came to the house.

About a half hour after arriving, Joe went into the Amelia Street house to use the restroom.  As he exited the house, he saw Graham roughly twenty feet away.  Graham was dressed in black and pulling a mask over his face.  Graham was also holding a shotgun.  Graham pointed the shotgun at Joe and fired several shots.  Joe ran.  He was the only individual to see Graham fire the shots, which damaged the home's siding, a post, an air-conditioning unit, and a propane tank.

None of the shots struck the individuals at the Amelia Street residence.  Graham fled the scene.

Later, Nicholas Dalton, a friend of Graham, saw him walking down the street and offered him a ride.  Shortly after Graham got in Dalton's vehicle, Dalton got in a single-vehicle accident.  A witness saw the vehicle drive off the road, hit a pole, and come to a stop.  A "young kid" with dark hair emerged from the vehicle carrying a gun and bag.  This individual ran into the weeds.

Around the same time as the shooting, Des Moines County Sheriff Mike Johnstone, Deputy Dilan Beaird, and Sergeant Kevin Glendening were at a fundraising event for the sheriff's department.  They received a call about the shooting and drove back to Burlington.  Johnstone, who was wearing a full uniform, drove the department's Dodge Charger.  The vehicle is unmarked except for official license plates and lights in the front grill and at the top of the front windshield.  The vehicle is made exclusively for law enforcement.  Glendening rode in the front passenger seat.  He wore a polo with the sheriff's emblem on the left chest, khaki pants, and a green sheriff's jacket with no markings.  Beaird, who sat directly behind Glendening, also wore khaki pants and the department polo shirt, but wore a jacket over the polo.  His badge hung around his neck over the jacket.  Johnstone ran his emergency lights and sirens until they were about one mile away from Plank Street.  Johnstone testified that they planned to set up a perimeter around the wooded area near Plank Street, believing Graham—who at this point had been identified as the suspect—was nearby.

Johnstone was pulling into a driveway on Plank Street when Glendening spotted Graham.  Graham was holding a shotgun in "ready-gun" position.

Johnstone immediately put the car in park, and Glendening began opening the door. Simultaneously, Glendening began standing up out of the vehicle and moved to un-holster his side arm. He also shouted, "Drop the gun." Graham fired within a fraction of a second of the command to drop the gun. Glendening slipped at the same time, landing in a seated position next to the vehicle. Graham's shot missed the officers and the vehicle, striking a building behind the officers.

Beaird could not exit the vehicle right away due to the vehicle's locks, but managed to exit shortly after Graham fired the shotgun. Both Glendening and Beaird discharged their service weapons. Ballistics testing would later show Beaird struck Graham in the leg. Graham fled into a wooded area; the officers did not pursue Graham into the woods.

Roughly forty-five minutes later, Graham emerged from the wooded area and was taken into custody by Burlington city police officers. When taken into custody, Graham informed police that he left the shotgun "at the top of the hill where he exchanged gunfire with officers." He also asked one officer, "I saw two cops. I aimed and shot at one of them. Did I kill him?" He also brought up how the police had killed his friend, Caleb Peterson, in an officer-involved shooting in September of that year. He recognized one of the arresting officers as an officer involved in Peterson's death.

Graham exhibited animosity toward law enforcement in the months between Peterson's death and the day of his arrest. Multiple officers testified that they were aware of Graham based on threatening comments he made towards police in recent weeks. Facebook messages from November 7, which Graham objected to at trial, also contained comments like, "On god tho cause I don't care

no more if jakes stop me I'm blowing them those are my opps rn [right now] they up one on the score for killing my mans." Similarly, he stated, "I'm bout to get mad an go to jail." When asked why, he responded, "Im smoking the[m]." Between the Amelia Street and Plank Street shootings, he told a friend, "an them cops one of them dead tonight like I'm serious." Two days before the shooting, he told a different friend he would "just go do what I been wanting to do kill some mf cops in my brothers name."

On November 26, 2019, the State charged Graham with (I) attempted murder of a police officer, (II) attempted murder, (III) intimidation with a weapon, (IV) going armed with intent, (V) assault on a peace officer, and (VI) carrying weapons. The State subsequently amended the charges to add firearm enhancements to the charges of intimidation with a weapon and assault on a peace officer. Graham filed a motion in limine, challenging the admissibility of evidence related to Peterson's death and Facebook messages related to Graham's anger at law enforcement. The court ordered that the matters, except for Peterson's death, were not to be discussed during voir dire or opening statements until the court made a ruling on their admissibility at trial. The judge later ruled the challenged Facebook messages and comments about Peterson's death were admissible evidence.

Trial took place over a period of three days in November 2020. On counts I and II, the jury found Graham guilty of the lesser-included offense of assault with intent to inflict serious injury in violation of Iowa Code section 708.2(1) (2019). Graham was found guilty as charged for intimidation with a weapon, in violation of section 708.6(2); going armed with intent, in violation of section 708.8; assault on

a peace officer with a firearm, in violation of sections 708.3A(1) and (2) and 902.7; and carrying weapons, in violation of section 724.2(1). Due to an error, the jury was instructed on a lesser charge for count III of intimidation with a weapon. Graham was found guilty on this charge.[1] The district court sentenced Graham to twelve years in prison: the two assault-with-intent-to-commit-serious-injury convictions and Graham's conviction for carrying weapons ran concurrently for two years, intimidation with a weapon and going armed with intent ran concurrently for five years, and the five years for assault on a peace officer ran consecutively to the other counts. The court applied the firearm enhancement, and as such, Graham must serve a minimum of five years before being eligible for parole, pursuant to Iowa Code section 902.7.

Judgment was entered February 9, 2021. Graham, while still represented by trial counsel, filed a pro se notice of appeal on February 22, after which the district court appointed an appellate defender. For reasons unclear from the record, appellate counsel did not file a notice of appeal until August 16, 2021. Appellate counsel also filed an application for delayed appeal.

## II.     Standard of Review

"We review constitutional double jeopardy claims de novo." *State v. Johnson*, 950 N.W.2d 21, 23 (Iowa 2020). We review a district court's rulings on evidentiary issues for an abuse of discretion. *Powers v. State*, 911 N.W.2d 774, 780 (Iowa 2018). A court abuses its discretion when its decision is "unreasonable or untenable." *Id.* (citation omitted). A "decision is 'unreasonable or untenable'

---

[1] The State agreed that Graham should be sentenced for the lesser offense.

when it 'is not supported by substantial evidence or when it is based on an erroneous application of the law.'" *Id.* (quoting *State v. Brown*, 856 N.W.2d 685, 688 (Iowa 2014)).

## III.   Discussion

Graham alleges his convictions for assault with intent to inflict serious injury and assault on a peace officer with a firearm should merge, as he is being punished twice for the same offense in violation of the Double Jeopardy Clause.  He also claims the district court judge erroneously admitted evidence of his animosity towards law enforcement.

### A.   Timeliness of Appeal

Judgment for Graham's conviction was entered February 9, 2021.  While still represented by trial counsel, Graham filed a pro se notice of appeal on February 22, stating, "I'm putting in a motion to appeal."  The district court appointed Graham counsel on February 24.  Counsel did not file a notice of appeal until August 16.  Graham's counsel subsequently filed an application for delayed appeal on August 20.  Our supreme court instructed the parties to address the application for delayed appeal in their briefing on the merits of the case.  As a result, we must first address whether Graham filed a timely notice of appeal.

Defendants are required to timely initiate and perfect an appeal if they wish to challenge their convictions on direct appeal.  In order to do so, they must file a notice of appeal "within 30 days after the filing of the final order or judgment."  Iowa R. App. P. 6.101(1)(b).  Graham filed his pro se motion thirteen days after the final judgment was entered.  Iowa Code section 814.6A generally prohibits a defendant represented by counsel from filing "any pro se document, including a brief, reply

brief, or motion, in any Iowa court." However, our supreme court recently held that "[e]ven assuming section 814.6A prohibited [a defendant] from filing a pro se notice of appeal while represented by counsel," a defendant may be "entitled to seek a delayed appeal." *State v. Davis*, 969 N.W.2d 783, 787 (Iowa 2022). To do so, a defendant must have "expressed a good faith intent to appeal before the appeal deadline but failed to timely perfect the appeal due to state action or circumstances beyond the defendant's control." *Id.* That being said, allowing a delayed appeal is not "a discretionary action based on mere excusable neglect. It is limited to those instances where a valid due process argument might be advanced should the right of appeal be denied." *Id.* (citation omitted).

This case is materially indistinguishable from *Davis*. In both cases, the defendant timely filed a pro se notice of appeal, expressing their good-faith intent to appeal. *See id.* The district court recognized the notice of appeal and appointed an appellate defender. *See id.* Also, counsel's late notice of appeal referenced the defendant's pro se notice of appeal. *See id.* Additionally, Graham, like Davis, was prevented from timely perfecting his appeal due to state action because, "[t]o the extent section 814.6A applies to a pro se notice of appeal, the state has imposed a statutory bar preventing a defendant represented by counsel from pursuing a statutory right of appeal." *Id.* Further, "we recognize that counsel's failure to timely file a notice of appeal was a circumstance outside the defendant's

control."[2]  *Id.* at 788.  Accordingly, we grant Graham's application for a delayed appeal and proceed to his claims.[3]

###  B.     Double Jeopardy

Graham argues the district court violated the Double Jeopardy Clause of the Fifth Amendment of the United States Constitution by imposing multiple punishments for the same offense when the district court sentenced him to consecutive sentences on his convictions for assault with intent to inflict serious injury and assault on a peace officer.[4]  He claims the offenses should have merged because they are based on the same offense.

The Double Jeopardy Clause, among other things, "protects against multiple punishments for the same offense."  *State v. Schmitz*, 610 N.W.2d 514, 515 (Iowa 2000) (citation omitted).  However, figuring out when a defendant is being punished for the same offense "has been characterized as a 'many headed hydra'" that "has perplexed courts for centuries."  *State v. West*, 924 N.W.2d 502, 504 (Iowa 2019) (citation omitted).

Our supreme court provided recent guidance for determining whether a conviction for one offense is a lesser-included offense of a greater one—that is, when deciding whether the lesser should merge into the greater offense.  Our

---

[2] The length of counsel's delay is not dispositive.  Our supreme court has granted delayed appeals when the notice of appeal was filed over two years after the statutory deadline.  *See State v. Newman*, 970 N.W.2d 866, ___, 2022 WL 627178, at *4 (Iowa 2022) (McDermott, J., dissenting).

[3] To the extent Graham alleges the district court gave an incorrect colloquy regarding his right to appeal, we need not reach the issue given our conclusion reached concerning the delayed appeal.

[4] Graham does not raise a claim that the convictions violate a similar provision of the Iowa Constitution, article 1, section 12.

courts have consistently held that a double jeopardy analysis contains two components: (1) the so-called legal-elements or *Blockburger* test, when the court analyzes whether two offenses share elements such that committing offense one by definition requires committing the other offense, *see Blockburger v. United States*, 284 U.S. 299, 304 (1932); and (2) whether the legislature intended multiple punishments. *See Johnson*, 950 N.W.2d at 25. Our supreme court in *West* held that "[t]he basic approach taken in these cases can be easily stated: the question of whether an offense is necessarily included in a greater offense is one of legislative intent. The *Blockburger* strict legal elements test is thus a tool in the analysis but is not solely determinative." 924 N.W.2d at 512 (internal citation omitted). In contrast, the court in *Johnson* held that "our first step is to apply the legal-elements test," and then courts engage in "a second step to the analysis: '[W]hether the legislature intended multiple punishments for both offenses.'"[5] 950 N.W.2d at 24-25 (alteration in original) (citation omitted).

Given the emphasis both *West* and *Johnson* place on the elements test, we will begin there. This test involves comparing "the elements of the two offenses to determine whether it is possible to commit the greater offense without also committing the lesser offense." *Id.* at 24 (citation omitted). If the greater offense can be completed without committing the lesser offense, the offenses do not

---

[5] *West* dealt with Iowa Code section 701.9, which codifies Iowa's prohibition against double jeopardy. However, the court recognized that "we decide[ ] . . . the statutory question under Iowa Code section 701.9 in a fashion similar to the federal double jeopardy cases." *West*, 924 N.W.2d at 512. Similarly, *Johnson* involved claims under both section 701.9 and the federal double jeopardy clause, although the court analyzed them simultaneously. *Johnson*, 950 N.W.2d at 23-24. Graham does not raise a claim under section 701.9.

merge. Where, as is the case here, there are multiple ways to commit an offense, "the alternative submitted to the jury controls." *State v. Jennings*, No. 09-0490, 2010 WL 1879547, at *3 (Iowa Ct. App. May 12, 2010).

The jury received two instructions relevant to Graham's claim. In order to convict Graham of assault with intent to inflict serious injury, the jury had to find:

> 1. On or about November 7, 2019, the Defendant intentionally pointed a firearm toward another person or displayed a dangerous weapon toward another person in a threatening manner.
> 2. This was done with specific intent to cause a serious injury.

To find Graham committed assault on a peace officer with a firearm, the jury had to find:

> 1. On or about November 7, 2019, the defendant assaulted Kevin Glendening.
> 2. The defendant had the apparent ability to do the act.
> 3. Kevin Glendening was a peace officer.
> 4. The Defendant knew at the time of the assault that Kevin Glendening was a peace officer.
> 5. The Defendant intentionally pointed or displayed a shotgun toward Kevin Glendening.

Assault on a peace officer contains several elements that assault with intent to commit serious injury lacks—most noticeably, the fact that the victim is a peace officer and that the defendant knew the victim was a peace officer at the time of the assault. Thus, assault on a peace officer is not a lesser-included offense of assault with intent to commit serious injury.

The inverse is also true. While both offenses can be committed with a similar act, their intent elements differ in important respects. Assault with intent to commit serious injury, as its name suggests, requires the *specific* intent to commit serious injury. In contrast, assault on a peace officer with a firearm is a general intent crime.

> Specific intent is present when from the circumstances the offender must have subjectively desired the prohibited result. General intent exists when from the circumstances the prohibited result may reasonably be expected to follow from the offender's voluntary act, irrespective of any subjective desire to have accomplished such result.

*State v. Fountain*, 786 N.W.2d 260, 264 (Iowa 2010) (quoting *State v. Redmon*, 244 N.W.2d 792, 797 (Iowa 1976)). A defendant could commit assault on a peace officer with a firearm without the specific intent of causing serious injury. As a result, assault with intent to commit serious injury is not a lesser-included offense of assault on a peace officer.

This is true even though, as Graham correctly points out, assault contains a specific intent element. Assault contains specific intent elements because a defendant commits assault with the intent "to cause pain or injury to the victim or to result in physical contact that would be insulting or offensive to the victim." *Fountain*, 786 N.W.2d at 265. However, the intent for assault is not the same as assault with the intent to commit serious injury—a defendant committing assault may not intend to cause a serious injury. Due to the differing intent elements, the offenses do not merge.

The legislative intent also supports this conclusion. Our legislature originally codified assault in section 708.2 in 1978 "as part of a 'complete revision of the substantive criminal law.'" *State v. Velez*, 829 N.W.2d 572, 580 (Iowa 2013) (citation omitted). Subsequently, the legislature amended the code in 1995 to include section 708.3A's prohibition on assault on person engaged in certain occupations. 1995 Iowa Acts 1995 ch. 90 § 3. The stated purpose of these changes was to "provide[ ] penalties and enhanc[e] penalties for" such assaults.

*Id.* Graham contends the legislature simply intended to provide increased, but not cumulative, penalties for assaulting peace officers. In contrast, the State suggests the legislature intended cumulative penalties. When the legislature enacts a statute, "it is presumed that . . . [t]he entire statute is intended to be effective." Iowa Code § 4.4(2). Thus, we presume the legislature intended to provide separate punishments.

Other indications support this conclusion. Significant in our analysis is the differing purposes of the statutes. *See State v. Halliburton*, 539 N.W.2d 339, 344-45 (Iowa 1995). Section 708.2 is targeted at certain conduct—assault—regardless of the victim's status. It protects the public at-large from assault. On the other hand, section 708.3A is meant to prohibit assaults on a certain subset of individuals. In doing so, it prevents two types of harm: protecting the public against assault, but also protecting the public against criminal defendants undermining many core government functions, including emergency services, human services, and the collection of revenue. *See* Iowa Code § 708.3A (prohibiting assault on firefighters, correctional staff, employees of the Iowa Department of Human Services, and employees of the Iowa Department of Revenue, among others). Thus, the legislature had different purposes in mind that would be undermined by merging the offenses. Because of the differing elements and other indicators of legislative intent, the offenses do not merge.

Finally, Graham urges us to take a different approach to our analysis by focusing on a line of cases that involve the unit-of-prosecution. In particular, he points us to two cases—*Velez*, 829 N.W.2d at 575, which dealt with whether two convictions for willful injury causing serious injury should merge, and *State v.*

*Copenhaver*, 844 N.W.2d 442, 445 (Iowa 2014), which involved whether two counts of second-degree robbery should merge. In both cases, the central issue was what the legislature intended the unit of prosecution to be; that is, at what point does one crime become two. Reliance on such cases is misplaced. Our supreme court has expressly noted that a separate test is used when the charges, such as in *Velez* and *Copenhaver*, arise from the same statute. *See Schmitz*, 610 N.W.2d at 516 ("Although the defendant relies on the 'same-elements' [*Blockburger*] test in arguing that double jeopardy has been violated here, that test is not applicable when the charges being compared arise under the same statutory provision." (emphasis omitted)). Because the charges arise under different statutory sections, cases like *Velez* and *Copenhaver* do not apply.

### C. Evidentiary Claim

Graham contends several pieces of evidence were improperly admitted at trial. In particular, he argues information related to the death of his friend in an officer-involved shooting and Graham's Facebook messages demonstrating his animosity towards police were not relevant, and even if they were relevant, such were overly prejudicial. Because we determine the evidence was relevant and the evidence's probative value was not substantially outweighed by its prejudicial impact, we conclude the district court did not abuse its discretion when admitting the evidence.

Iowa Rule of Evidence 5.401 provides that evidence is relevant if "[i]t has any tendency to make a fact more or less probable than it would be without the evidence" and "[t]he fact is of consequence in determining the action." We determine the challenged evidence is relevant. The State was required to prove

that Graham knew he was shooting at law enforcement. His clear intention to retaliate against the police for the death of his friend is relevant for that purpose. We next turn to Graham's assertion that even if relevant, the challenged evidence was unfairly prejudicial

Iowa Rule of Evidence 5.403 provides: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." We analyze whether evidence should be excluded under rule 5.403 through a two-part test. *State v. Buelow*, 951 N.W.2d 879, 889 (Iowa 2020). "First, we consider the probative value of the evidence. Second, we balance the probative value against the danger of its prejudicial or wrongful effect upon the triers of fact." *Id.* (quoting *State v. Webster*, 865 N.W.2d 223, 242 (Iowa 2015)).

Probative value refers to "the strength and force of the evidence to make a consequential fact more or less probable." *Webster*, 865 N.W.2d at 242 (quoting *State v. Martin*, 704 N.W.2d 665, 671 (Iowa 2005)). In contrast, evidence is unfairly prejudicial when "it has 'an undue tendency to suggest decisions on an improper basis commonly, though not necessarily, an emotional one.'" *State v. Putman*, 848 N.W.2d 1, 14 (Iowa 2014) (citation omitted). Unfair prejudice can result when the evidence "appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or triggers other mainsprings of human action that may cause a jury to base its decision on something other than the established propositions in the case." *Webster*, 865 N.W.2d at 242-43 (citation omitted). Our supreme court has noted several points when engaging in a rule 5.403 analysis:

> Courts should use rule 5.403 sparingly since it allows for relevant evidence to be excluded. All powerful evidence is prejudicial to one side. The key is whether the danger of unfair prejudice substantially outweighs the evidence's probative value. If the balance between the evidence's probative value and prejudicial effect is relatively close, the evidence should be admitted.

*Buelow*, 951 N.W.2d at 889 (internal citations omitted).

Graham contends evidence related to Peterson's death and his Facebook messages should have been excluded because of the unfair prejudicial effect on the jury. We disagree. First, the evidence is probative in several respects. The evidence shows Graham's knowledge that the unmarked police cruiser contained police officers. For instance, in a message to his sister, Graham stated, "I got a move i hear sirens." Such is evidence that indicated he knew police vehicles were nearby and allows the reasonable inference that Graham knew the sheriff's vehicle contained law enforcement. Similarly, after the shooting of the Amelia Street house, a friend appealed to Graham to return to a different friend's house because they did not want to go to another friend's funeral. Graham responded, "[r]etaliation is all I care about." He explained to another individual, "I'm not on my feet rn [right now] so either way this goes Liz derick an them cops one of them dead tonight like I'm serious." Given the proximity to the Plank Street shooting, the message demonstrates Graham's desire to get even with the police for the death of Peterson. Combined with the discussed message about sirens, the message demonstrate Graham knew he was firing upon law enforcement. Additionally, the messages and testimony on Graham's anger over Peterson's death demonstrate his desire to harm police, supporting a finding Graham believed the intended targets of his shooting were law enforcement officers.

Without a doubt, the testimony and Facebook messages contain information that is prejudicial to Graham. However, "[a]ll powerful evidence is prejudicial to one side. The key is whether the danger of unfair prejudice substantially outweighs the evidence's probative value." *Buelow*, 951 N.W.2d at 889 (citation omitted). To exclude evidence, the probative value must be *substantially* outweighed by unfair prejudice. Given the relevance of the evidence, we cannot say the district court abused its discretion concerning the admissibility of the evidence challenged by Graham.

**AFFIRMED.**