# IN THE COURT OF APPEALS OF IOWA

No. 23-0742
Filed January 23, 2025

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**STANLEY LAVELL DONAHUE,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Linn County, Christopher L. Bruns, Judge.

        A criminal defendant appeals ten convictions, including attempted murder of a peace officer. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH DIRECTIONS.**

        Martha J. Lucey, State Appellate Defender, and Shellie L. Knipfer, Assistant Appellate Defender, for appellant.

        Brenna Bird, Attorney General, and Sheryl Soich, Assistant Attorney General, for appellee.

        Considered by Schumacher, P.J., and Buller and Langholz, JJ.

**BULLER, Judge.**

Stanley Donahue appeals ten convictions relating to the robbery of a convenience store and the attempted murder of Linn County Deputy Sheriff William Halverson. Donahue challenges the sufficiency of the evidence supporting his convictions for trafficking stolen weapons, attempted murder of a peace officer, and two counts of robbery in the first degree, as well as the district court's evidentiary ruling admitting a statement Deputy Halverson made while he feared death. On our review, we affirm all of Donahue's convictions except for trafficking stolen weapons, which we reverse in accord with the State's concession. We therefore affirm in part, reverse in part, and remand with directions.

## I. Background Facts and Proceedings

In June 2021, Jacob Christianson, a twenty-one-year-old "pizza artist," was working the night shift at the Casey's convenience store in Coggon with his coworker, eighteen-year-old Maddie Stepanek. Early that morning, another employee had spotted a suspicious van and a man who tried to enter the store even though it was closed; this other employee left a note about it to warn later shifts. When a man in a black hoodie drove up in a van and walked into the store around 10:00 p.m. that night, Christianson remembered the note, "got an eerie feeling that something might happen," and warned Stepanek to "stay down" in the kitchen in case it wasn't safe.

The man in the hoodie—later consistently identified by all eyewitnesses as Donahue—got a carton of chocolate milk from the cooler, went up to the register, and paid with cash. When Christianson went to give him change, Donahue "pulled out the gun"—a black pistol—and said, "Give me the money." Christianson opened

the register, triggered the silent alarm, and handed the cash to Donahue.  Donahue then ordered Christianson to the next register, where Christianson did the same thing.  Next, Donahue ordered Christianson into the kitchen, where Christianson told Stepanek to call the police while he "stall[ed]": he told Donahue that Stepanek was washing her hands.  Tucked around the corner by the sinks, Stepanek dialed 911 on her cell phone.

Donahue grabbed a variety of merchandise—including cigarettes, gift cards, phone chargers, and headphones—as well as Stepanek's purse and Christianson's wallet.  Eventually Donahue directed Christianson back toward the kitchen and followed at some distance.  Stepanek hung up her 911 call when the men approached the kitchen.  Donahue asked if she "had any money or anything back in the kitchen," and she said she "only had the food."

Donahue ordered Stepanek and Christianson into the walk-in cooler.  They raised their hands and complied; in Stepanek's words, she "was scared what else would happen if [she] didn't."  The two sat down in the cooler, and Stepanek started "freaking out" and "kept telling [Christianson] what if we don't make it, what if he comes back, what if I don't go to college, don't make it to college."  Stepanek was crying, and Christianson tried to console her.  Donahue told them to stay in the cooler, asked if they had phones, and shut the cooler door.  After a few minutes, Christianson and Stepanek heard multiple gunshots.

Unbeknownst to Stepanek and Christianson, surveillance footage captured Donahue taking proceeds of the robbery out to his van, then returning to steal more merchandise from the store.  Meanwhile, Deputy Halverson was responding to the silent alarm in his patrol vehicle.  When Deputy Halverson ran up to the store and

didn't see a cashier or any employees by the registers, he entered and found Donahue leaving with a garbage bag of stolen goods. Deputy Halverson ordered Donahue to turn around and attempted to arrest him, but Donahue backed away, pulled the black pistol from his pocket, and started firing rapidly at close range. Deputy Halverson didn't know how many times he'd been shot, but he knew he'd been hit multiple times. Approximately ten shots can be heard on the surveillance footage. Deputy Halverson thought he was going to die and—in his words—fell "face first onto the ground like a pancake." Some of the shots struck his vest, but he was in pain and bleeding, he saw stars, and he couldn't move his legs.

Donahue took Deputy Halverson's service weapon from its holster, and Deputy Halverson was too injured to stop him. Deputy Halverson said, "please don't kill me," and Donahue left with Deputy Halverson's gun and the stolen property, got in his van, and drove off. Deputy Halverson radioed for help, using an alert to communicate "officer down." He told a first-responding officer "something along the lines of . . . tell my wife and kids that I love them."

A medivac helicopter took Deputy Halverson to the University of Iowa Hospitals for treatment. His injuries included fractures in his femur, lower-back vertebrae, hips, and skull, as well as crush damage to his torso from gunshots that struck his bulletproof vest. As best as medical professionals could determine, Deputy Halverson was hit by seven shots. Treatment required permanent placement of several rods in Deputy Halverson's body, and some of the bullets could not be removed. It took six months of recovery before Deputy Halverson could walk on his own, and he expected to have lifelong pain from the injuries inflicted by Donahue.

Back in Coggon, another deputy sheriff spotted the van and was in hot pursuit, with lights and sirens activated. The deputy identified Donahue as the driver, and Donahue—operating the van with no lights—eluded the deputy by swerving around the squad car and going more than double the speed limit until he crashed into cement blocks near a closed bridge. Donahue took off on foot and the deputy attempted to pursue but eventually lost sight of him. Another deputy joined the search and, with the assistance of K-9 Officer Bingo, pursued Donahue through a backyard and some fields. Bingo followed Donahue's scent to a "grassy area [that] looked like to be the size of a human that may have been laying down there." Bingo lost Donahue's scent at a gravel road; Bingo's handler explained that gravel tends to interfere with a dog's tracking.

Over the noon hour the next day, deputies found Donahue on a gravel road not far from where Bingo had lost the scent. Law enforcement officers—including Bingo—arrested Donahue. In a deputy sheriff's words, Donahue "looked disheveled, as I would describe it, and [his clothes] looked dirty with mud. Appearing as if someone had come out of a field is how I envisioned it." Donahue's pants, sweatshirt, and boots were all caked with mud. As was his body. A search of Donahue's person turned up around $300 cash, as well as the silent alarm trigger from Casey's.

Deputies found the van abandoned in a nearby field. Inside the van, they found Casey's gift cards; phone chargers; headphones; eight cartons and individual packages of cigarettes; Stepanek's purse and its contents, including her Apple watch, University of Northern Iowa student lanyard, and her wallet containing her credit and identification cards; and the garbage bag Donahue

carried as he fled the crime scene. A deputy testified these items were all "consistent with" what was stolen from Casey's; a manager later identified missing property including $239 cash, eighty-nine packs of cigarettes (some in cartons, some not), and an unknown number of electronics and gift cards. In other fields along Donahue's route, deputies found Christianson's library card, his school identification card, a large number of loose coins and a few cash bills, a gift card, and various other items.

Donahue was the van's registered owner, and his tax returns were found in the glovebox. The sheriff's office later determined Donahue's van matched the make, model, and license plate of the suspicious van seen on surveillance footage at the Coggon Casey's the morning of the robbery. A deputy testified the suspicious person seen in surveillance video generally matched Donahue's physical appearance, and the jury was able to view the video at trial.

Deputies found two guns on the floorboards inside the van: Deputy Halverson's service weapon and a SIG Sauer pistol that the Division of Criminal Investigation (DCI) later established was the attempted-murder weapon. Donahue's fingerprint was found on the magazine inside the SIG Sauer pistol. And DCI testing confirmed shells from the scene and a bullet recovered from Deputy Halverson's body were all fired by the SIG Sauer.

Donahue was generally uncooperative when interviewed, denied involvement in the shooting and robbery, made a number of false statements, and accused officers of being racist. Donahue did not testify at trial but instead

presented an expert witness who discussed studies relating to the reliability of eyewitness identification.[1]

The jury found Donahue guilty as charged on all ten counts: one count of attempted murder of a peace officer, a special class "B" felony in violation of Iowa Code section 707.11(2) and (5) (2021); two counts of robbery in the first degree, class "B" felonies in violation of sections 711.1(1)(b) and 711.2; one count of willful injury causing serious injury, a class "C" felony in violation of section 708.4(1); one count of eluding, a class "D" felony in violation of section 321.279(3); one count of trafficking stolen weapons, a class "D" felony in violation of section 724.16A; one count of disarming a peace officer, a class "D" felony in violation of section 708.13(2); one count of felon in possession of a firearm, a class "D" felony in violation of section 724.26(1); and two counts of false imprisonment, serious misdemeanors in violation of section 710.7. The court sentenced Donahue to a total of 107 years in prison, with a mandatory minimum of 25 years before any possibility of parole. *See* Iowa Code § 707.11(5)(c). Most of the convictions were ordered to run consecutively, with the willful-injury offense ordered concurrent to all and the trafficking-stolen-weapons and disarming-a-peace-officer counts running concurrent to each other but consecutive to all other counts.

Donahue appeals.

## II. Standards of Review

We review the sufficiency of the evidence for correction of errors at law. *State v. Jones*, 967 N.W.2d 336, 339 (Iowa 2021). "In determining whether the

---

[1] We express no view in this opinion on the admissibility of such expert testimony.

jury's verdict is supported by substantial evidence, we view the evidence in the light most favorable to the State, including all 'legitimate inferences and presumptions that may fairly and reasonably be deduced from the record evidence.'" *Id.* (citation omitted).

"We review the district court's evidentiary rulings for abuse of discretion." *State v. Neiderbach*, 837 N.W.2d 180, 190 (Iowa 2013). "A court abuses its discretion when its 'discretion was exercised on grounds or for reasons clearly untenable or to an extent clearly unreasonable.'" *State v. Putman*, 848 N.W.2d 1, 7 (Iowa 2014) (citation omitted).

### III. Discussion

Donahue raises three challenges to the sufficiency of the evidence and contests an evidentiary ruling. We address each separately.

### A. Sufficiency of the Evidence—Trafficking Stolen Weapons

As his first claim on appeal, Donahue contends his conviction for trafficking stolen weapons should be reversed because the statutory elements required he know that the firearm was already stolen when he took possession of the gun or facilitated its transfer. The record establishes Donahue took possession of the weapon from the lawful possessor—Deputy Halverson. The State concedes error, citing two of our unpublished cases. *See State v. Steide*, No. 21-0620, 2022 WL 2348157, at *3 (Iowa Ct. App. June 29, 2022); *State v. Trujillo*, No. 19-0686, 2020 WL 4499559, at *4 (Iowa Ct. App. Aug. 5, 2020). We accept the State's concession given the case law, reverse Donahue's conviction for trafficking stolen weapons, and vacate the sentence on that count without further analysis.

**B. Sufficiency of the Evidence—Attempted Murder of a Peace Officer**

Donahue disputes two elements of his attempted-murder-of-a-peace-officer conviction: (1) that he had specific intent to kill and (2) that he expected to set in motion a force or chain of events which would cause or result in the death of Deputy Halverson. We conclude both elements were supported by substantial evidence.

The main thrust of Donahue's argument is that, if he wanted to kill Deputy Halverson "he would have shot him in a more fatal spot." To put it mildly, we are not persuaded. The case law decisively rejects this argument, as recently summarized by the supreme court in a case addressing a similar claim:

> "[T]he general rule is that one who arms himself with the express purpose of shooting another cannot ordinarily claim the elements of" murder or attempted murder are lacking. *State v. Smith*, 240 N.W.2d 693, 695 (Iowa 1976); *see State v. Green*, 896 N.W.2d 770, 780 (Iowa 2017) (stating a "rational juror could infer that one who uses a dangerous weapon intends to cause physical harm, and even to kill"); *State v. Clarke*, 475 N.W.2d 193, 197 (Iowa 1991) (holding that firing two shots at someone was substantial evidence of intent sufficient to support convictions for attempted murder and willful injury); *State v. Mart*, 237 Iowa 181, 20 N.W.2d 63, 66 (1945) ("We have held repeatedly that an intent to kill may be inferred from the use of a deadly weapon in a deadly manner. Such intent may be thus inferred though the wound inflicted does not prove fatal." (citation omitted)).

*State v. Mong*, 988 N.W.2d 305, 314–15 (Iowa 2023).

First, we recognize the obvious: shooting somebody with a gun is strong evidence of intent to kill. To the extent Donahue's argument warrants a more specific analysis, we conclude the possibility he might have arguably selected more lethal means of attempting to kill a peace officer does not negate his intent or undermine his conviction. *See State v. Roby*, 495 N.W.2d 773, 776 (Iowa 1992)

("This court will not find [the defendant] lacked the intent to kill [the victim] simply because he could have used a different method which would have been much more brutal and effective in causing [the victim's] death . . . ."); *see also State v. Young*, 686 N.W.2d 182, 185–86 (Iowa 2004) (noting section 707.11 makes clear that it is "the actor's expectation of the consequences of his or her act, not the probability of the act's success" that establishes guilt for attempted murder). The only logical inference to be drawn from shooting at a peace officer approximately ten times is that the shooter intended to kill the officer and expected to set in motion a course of events that would result in the officer's death. We therefore affirm Donahue's conviction for the attempted murder of Deputy Halverson.

### C. Sufficiency of the Evidence—Robberies

Donahue next contends the supreme court should overrule *State v. Copenhaver*, 844 N.W.2d 442, 449, 452 (Iowa 2014) and resurrect the single-larceny rule. We lack authority to overrule supreme court precedent, even if we were inclined to do so. *See State v. Beck*, 854 N.W.2d 56, 64 (Iowa Ct. App. 2014). And we note the supreme court recently declined another defendant's request to overrule *Copenhaver* in *State v. Lee*, 6 N.W.3d 703, 707–08 (Iowa 2024).

Donahue also argues that, even under *Copenhaver*, there was only one robbery because he only intended to commit one theft and only committed one assault. 844 N.W.2d at 449 (discussing the unit of prosecution for robbery). We disagree and find the evidence sufficient to support both robbery convictions. On the theft question, we conclude the intent to steal cash and merchandise from Casey's is sufficiently distinct from the intent to steal the wallet from Christianson

and the purse and personal effects from Stepanek.  Asking Stepanek if she had any money in the kitchen may have also supported an independent theft.  Under *Copenhaver*, this evidence supports at least two robbery convictions.  *See id.* at 450–51 (collecting cases).  As to the assaults, Donahue brandished his gun at Christianson—an assault under Iowa Code section 708.1(2)(c)—and engaged in other acts sufficient to place Stepanek in fear of painful, injurious, insulting, or offensive contact coupled with the apparent ability to act—an assault under section 708.1(2)(b)—when he ordered her to walk into the cooler.  Stepanek's subjective experience was circumstantial evidence supporting this conclusion: she was afraid, "freaking out," thought she was going to die, and walked into the cooler with her hands in the air.  The robbery convictions were supported by sufficiently separate acts to satisfy the unit of prosecution established in *Copenhaver*.

### D.  Evidentiary Ruling—Deputy Halverson's Statement

Before trial, Donahue sought to exclude statements Deputy Halverson and other law enforcement officers made at the scene, on the basis that they had little or no probative value and were substantially more unfairly prejudicial than probative.  The county attorney argued the evidence was circumstantially probative on Donahue's intent to kill, direct evidence that Deputy Halverson suffered a serious injury carrying a substantial risk of death, and that it was "res gestae" or inextricably intertwined with the offense such that it could not be excised.  The district court ruled that Deputy Halverson's subjective perceptions and one of his statements—"tell my wife and kids I love them"—were probative on the severity of his injuries, while excluding any statements beyond that (including those of other peace officers).  The court explained that it believed exercising its "discretion [and]

splitting the baby this way almost completely eliminates any prejudice—unfair prejudice to the defendant while still allowing the State to show the jury the overall picture of what is happening."

Donahue asserts the district court abused its discretion. But we discern no abuse of discretion in the district court's "split the baby" approach, by which it allowed Deputy Halverson's most probative statement into evidence while excluding all of the other challenged evidence.

Relevance under Iowa Rule of Evidence 5.401 is a low bar. "The test is whether a reasonable person might believe the probability of the truth of the consequential fact to be different if he knew of the proffered evidence." *State v. Plaster*, 424 N.W.2d 226, 229 (Iowa 1988) (cleaned up). The district court reasoned that the evidence was admissible to show Donahue's specific intent to kill and that Deputy Halverson's injuries qualified as a "serious injury" that carried a substantial risk of death. We think both theories of relevance are valid, though there is more persuasive force to the second. Deputy Halverson's perception of his injuries was indirect circumstantial evidence as to Donahue's intent under the theory that a defendant intends the "natural and probable consequences" of their actions—Deputy Halverson's near-death experience was the natural and probable consequence of Donahue repeatedly shooting him. *See State v. Taylor*, 689 N.W.2d 116, 132 (Iowa 2004); *see also State v. Hunt*, 801 N.W.2d 366, 377 (Iowa Ct. App. 2011) ("Intent to kill or seriously injure another may be inferred from the type and number of injuries suffered by the victim."). And it was evidence relevant to whether Deputy Halverson sustained a serious injury, as required to support Donahue's conviction for willful injury causing serious injury.

Having established the probative value of this evidence, we consider whether the district court abused its discretion in weighing the probative value against the danger of unfair prejudice. *See Neiderbach*, 837 N.W.2d at 202. As the supreme court has recognized, "all powerful evidence is prejudicial to one side. The key is whether the danger of *unfair* prejudice substantially outweighs the evidence's probative value." *Id.* We discern no abuse of discretion in the district court's ruling. "Weighing probative value against prejudicial effect is not an exact science, so we give a great deal of leeway to the trial judge who must make this judgment call." *Putman*, 848 N.W.2d at 10 (cleaned up). We conclude the district court did not abuse its broad discretion to parse the evidence and admit one of Deputy Halverson's statements while excluding significant other evidence that was arguably less probative or potentially more prejudicial. These are the kinds of judgment calls we entrust to district judges, and Donahue has identified nothing clearly erroneous, untenable, or unlawful in the reasoning employed below. *See id.* at 8.

But even if we found an abuse of discretion in the district court's ruling, we conclude that, in the context of the entire trial, the admission of this statement did not prejudice Donahue's substantial rights. The State's evidence of Donahue's guilt was overwhelming—the crime was on video, there were multiple eyewitnesses, the fruits of the robberies were found on or near Donahue's person and vehicle, and his fingerprint was found on the magazine of the attempted-murder weapon. Contrary to Donahue's assertions on appeal, this was not a close case on intent or any other element. And we do not think the statements at issue carried any real risk of inflaming the jury more than the video

or a clinical description of the facts already had: Donahue resisted arrest, immediately opened fire on Deputy Halverson with approximately ten rounds at close range, struck him with at least seven projectiles, stole his service weapon, and left him bleeding on the floor from multiple gunshot wounds while carrying a trash bag full of stolen merchandise out the door. The offense itself is callous and grave, and we see no reasonable likelihood admitting Deputy Halverson's statement risked the jury would convict on an improper basis. *Cf. State v. Seehan*, 258 N.W.2d 374, 378 (Iowa 1977) ("Evidence of this nature [(autopsy photos)] tends to be gruesome because murder is gruesome."). For these reasons, we conclude admission of Deputy Halverson's statement about his family was harmless, even if improperly admitted.

## IV. Disposition

We affirm Donahue's convictions for attempted murder of a peace officer, two counts of robbery in the first degree, willful injury causing serious injury, eluding, disarming a peace officer, felon in possession, and two counts of false imprisonment. In line with the State's concession, we reverse Donahue's conviction for trafficking stolen weapons, vacate that portion of the sentence, and remand with directions for the district court to dismiss that count.

On remand, we further direct the district court to enter an amended sentencing order striking the judgment and sentence for trafficking stolen weapons. This disposition does not require formal resentencing with Donahue's personal presence. The district court ordered the trafficking-stolen-weapons conviction to be served concurrently to the disarming-a-peace-officer count but consecutive to all other counts, and those two offenses carry identical penalties.

As a result, the district court on remand will not be imposing a "new and different" sentence, nor a sentence that is "more onerous." *See State v. Cooley*, 691 N.W.2d 737, 741 (Iowa Ct. App. 2004); *see also State v. Johnson*, 222 N.W.2d 453, 458 (Iowa 1974). Donahue's total term of incarceration remains the same, and we are confident vacating the trafficking-count sentence will not undermine the sentencing scheme utilized by the district court.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH DIRECTIONS.**